# Illinois Official Reports

## Appellate Court

<hr>

### *People v. Sweet*, 2017 IL App (3d) 140434

<hr>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEREK I. SWEET, Defendant-Appellant. |
| District & No. | Third District<br>Docket Nos. 3-14-0434, 3-16-0346 cons. |
| Filed<br>Rehearing denied | September 8, 2017<br>October 2, 2017 |
| Decision Under Review | Appeal from the Circuit Court of McDonough County, No. 01-CF-141; the Hon. Dwayne Morrison, and the Hon. Richard Gambrell, Judges, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Peter A. Carusona, and Dimitrios G. Golfis, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Matthew P. Kwacala, State's Attorney, of Macomb (Patrick Delfino, Lawrence M. Bauer, and Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justices Lytton and Schmidt concurred in the judgment and opinion. |

¶ 1    Defendant, Derek I. Sweet, appeals the denial of his postconviction petition after a third-stage evidentiary hearing. On appeal, defendant argues this court should reverse the trial court's denial of his postconviction petition because he was denied the reasonable assistance of postconviction counsel where his postconviction counsel failed to present any evidence in support of his claim that his trial counsel, Gayle Carper, was operating under a *per se* conflict of interest at the time of defendant's guilty plea. Defendant also appeals the dismissal of his petition for relief from judgment filed pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2012)), arguing that (1) the trial court erroneously dismissed the section 2-1401 petition and (2) the trial court abused its discretion by denying defendant's request for counsel to be appointed for representation on his section 2-1401 petition. We affirm both the denial of defendant's postconviction petition and the dismissal of his petition for relief from judgment.

¶ 2                                    FACTS
¶ 3                              A. Background
¶ 4    On September 10, 2001, at the age of 25, defendant was charged with first-degree murder of two-year-old Faith Hamann. The charging instrument was subsequently amended, alleging that defendant had "without lawful justification, bent Faith Hamann backwards, bending her back, causing a separation of the vertebrae and a torn aorta, knowing such acts created a strong probability of great bodily harm to Faith Hamann, thereby causing the death of Faith Hamann." Defendant was represented by John Carter, a public defender.

¶ 5    On October 1, 2001, after a preliminary hearing, defendant pled not guilty. On August 5, 2002, Carter withdrew as counsel for defendant due to a conflict of interest. The trial court appointed Gayle Carper as defendant's new counsel.

¶ 6    On December 3, 2002, defendant's jury trial began. On the first day of trial, the State's evidence showed that defendant and his girlfriend, Sarah, were living together with Sarah's two children—seven-year-old Logan and two-year-old Faith. On the evening of Faith's death, Sarah had gone out to run errands, leaving the children with defendant. Twenty minutes later defendant called 9-1-1 because Faith was not breathing. Upon arrival at the home, the police chief observed Faith lying on the kitchen counter, unresponsive, and defendant standing next to her. Defendant appeared panicked and upset. Defendant initially indicated that Faith was in bed when he heard a thud, he found her facedown, and she was not breathing. An autopsy showed Faith had a torn aorta, which caused her to bleed to death internally, and she had an abnormal separation of the vertebrae caused by a forced hyperextension of her body backwards. A medical doctor opined that a massive amount of force was required to cause the injuries to Faith and death would come within minutes of the injuries. Defendant informed an investigator that he had picked up Faith while she was facedown, with her feet in one hand and her head in his other hand, and he bent her up so that her feet touched her head until he heard her back snap.

¶ 7    On the second day of trial, the prosecutor indicated that he would be calling one more witness to testify. The trial court announced it had been informed that defendant wished to withdraw his plea of not guilty and, instead, enter a plea of guilty. The trial court admonished

defendant in relation to his guilty plea and the sentencing range for the murder charge. The trial judge asked defendant if he understood that the charge against him carried a penalty range of 20 to 100 years of imprisonment, to which defendant responded, "Yes, sir." The trial judge asked defendant if he was telling the court that on September 7, 2001, he had bent Faith Hamann back, causing a fracture to the spine and a torn aorta, without lawful justification, knowing that action created a strong probability of causing her death, and that he committed the alleged offense. Defendant responded, "Yes, sir." The trial court accepted defendant's plea of guilty.

¶ 8        On March 7, 2003, the trial court sentenced defendant, who was then 27 years old, to 50 years of imprisonment. Carper filed a motion, on defendant's behalf, for the trial court to reconsider the sentence

¶ 9        Prior to a hearing on the motion to reconsider sentence filed by Carper, defendant filed a *pro se* motion to reconsider the sentence and a *pro se* motion to withdraw his guilty plea, alleging that Carper had failed to investigate his defense and had coerced him into pleading guilty by telling him he would get a 20-year sentence if he pled guilty and a life sentence if he did not plead guilty. In support of his motion to withdraw his guilty plea, defendant claimed that he received inadequate representation of counsel because Carper should have presented a defense but, instead, "she did not say anything whatsoever to counter balance the States Attorney's unfounded evidence, for this crime [he] did not commit." Defendant further claimed that he was coerced into pleading guilty by Carper, who told defendant that the judge felt sorry for him, felt he had shown enough remorse, looked at defendant as if he were his own son sitting in defendant's chair, felt defendant was not involved in Faith's death, and felt that even if defendant were involved in Faith's death, it was an accident and not intentional. Defendant also argued that Carper told him that if he refused to enter an open plea of guilty, he was going to get a life sentence. Defendant further claimed that a thorough investigation of the crime was not completed.

¶ 10        In his motion for reduction of sentence, defendant indicated that his sentence should be reduced because, among other things, (1) his attorney "should have presented a defense period" and his attorney "didn't say anything whatsoever to counter balance the State Attorney's unfounded evidence"; (2) a thorough investigation had not been done, over 200 names were given and no one checked them out, and "no full or any defense investigation period"; and (3) his attorney had guaranteed him "an easy and short 20 year sentence" and he feels his counsel violated his rights and "took prime advantage of [him] not knowing the law or laws of the nature of [the] crime committed."

¶ 11        On April 21, 2003, Carper filed a motion to withdraw as defendant's counsel. In the motion, Carper indicated that defendant's *pro se* motions contained false allegations regarding her representation and that her continued representation of defendant "would violate several Rules of Professional Conduct," with Carper citing to Rules 1.16, 2.1, and 6.2 of the Illinois Rules of Professional Conduct of 2010 (Ill. R. Prof'l Conduct (2010) Rs. 1.16, 2.1, 6.1 (eff. Jan. 1, 2010)). Carper indicated that Rule 6.2 provided that a lawyer should not seek to avoid the appointment to represent a person, except for good cause, such as when representing the client will likely violate the Illinois Rules of Professional Conduct or when "the client or the cause is so repugnant to the lawyer as to be likely to impair the client-lawyer relationship or lawyer's ability to represent the client."

¶ 12        The hearing on Carper's motion to withdraw took place on June 6, 2003. Carper indicated that on the day she came to court to argue the motion to reconsider sentence she had filed, she was informed that defendant had filed several *pro se* motions. Carper further indicated that that bulk of defendant's allegations in his *pro se* motions pertained to her representation. She stated, "because I consider those allegations in his motions to be false, I feel that it would be, it would be requiring me to violate a number of rules of professional conduct to continue to represent him," and she referenced Rules of Professional Conduct 1.16, 2.1, and 6.2. The trial court asked defendant if he objected to Carper withdrawing as his counsel. Defendant stated, "I have no problem with that, sir." The trial court appointed Heidi Benson as defendant's new counsel. Benson filed posttrial motions on behalf of defendant, which the trial court denied.

¶ 13        Defendant appealed, arguing that his guilty plea should be vacated as having been entered unknowingly and involuntarily due to the trial court's failure to admonish him properly. He also argued that the requirement for those convicted of first degree murder of a child to register as a sex offender was unconstitutional. Defendant's conviction and sentence were affirmed, with this court rejecting his argument that his plea was unknowing and involuntary and rejecting his constitutional challenge to the sex offender registration requirement. *People v. Sweet*, No. 3-03-0837 (2005) (unpublished order under Supreme Court Rule 23).

¶ 14                                B. Postconviction Petition

¶ 15        On March 2, 2006, defendant filed a postconviction petition, alleging Carper had coerced him into pleading guilty when she knew the State's evidence against him was weak, she had plenty of evidence to put on an overwhelming defense, and she mislead him into entering a "blind plea." He further alleged that Carper neglected to ensure a proper defense investigation was conducted by the assigned private investigator and medical expert to "clear up the charges and to clearly see what was going on." He claimed that, at trial, the credibility of the State's medical expert regarding Faith's autopsy and the credibility of other witnesses could have been called into question, evidence could have been presented that his confession was coerced, evidence that Faith had died prior to defendant arriving home could have been presented, evidence that Faith's mother had a background of abuse and neglect and involvement with the Department of Children and Family Services (DCFS) could have been presented, and the manner in which the police investigation was conducted could have been called into question. He claimed that that he was not given *Miranda* warnings prior to speaking with police and the coroner. Defendant also claimed that his appellate counsel provided ineffective assistance for failing to present additional issues on appeal.

¶ 16        More specific to Carper's representation, defendant alleged that Carper "never believed in [his] innocence," and she had been assigned to his case only four months prior to trial. He alleged that Carper did not investigate any of his claims, did not have key defense witnesses interviewed, and did not file any pretrial motions. Defendant alleged that Carper "never intended to present a defense" and had him "plea out for no apparent good reason." He claimed that as soon as he "spoke out about [Carper's] poor representation," Carper filed a motion to withdraw as his counsel. Defendant claimed that Carper prejudiced the court against him when she, in presenting her motion to withdraw, indicated to the court that defendant's allegations of ineffective assistance were false and that she found defendant's case to be "morally offensive" and him and his cause "too repugnant," at a time when defendant had a pending motion to withdraw his guilty plea on file. According to defendant, Carper's actions and statements made

- 4 -

it impossible for the trial judge to hear his motion to withdraw his guilty plea with an open and unbiased mind. Defendant claimed that Carper's view of the nature of his case, as "morally offensive" or "too repugnant," was the view that she held "all along" and rather than Carper withdrawing as defendant's counsel, she, perhaps, stayed on the case "long enough to sell [him] up the river." Defendant alleged that Carper had no intention of providing him with a defense and failed to investigate his claims of innocence, improper police conduct, police brutality, an illegal and tainted crime scene, and coerced statements. He also claimed that Carper was ineffective for failing to go to trial, failing to seek a jury instruction on the lesser charge of manslaughter, failing to seek an outright acquittal, and, instead, coercing him into entering a blind plea at a point in the trial when only the State's witnesses were heard and no defense or rebuttal for defendant had been presented.

¶ 17    Defendant's postconviction petition was stricken as premature because defendant's petition for leave to appeal to the Illinois Supreme Court was still pending. Defendant's petition for leave to appeal was subsequently denied. On October 6, 2010, the trial court reinstated defendant's postconviction petition and, subsequently, docketed defendant's postconviction petition for second-stage consideration and appointed postconviction counsel. On May 4, 2011, the State filed a motion to dismiss defendant's *pro se* postconviction petition.

¶ 18    On February 3, 2014, postconviction counsel filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2012), certifying that he read the trial transcript, reviewed the entire circuit court file and the appellate court filings, corresponded with defendant by mail to ascertain his contentions of constitutional violations, reviewed all correspondence from defendant, investigated the legality of defendant's allegations by way of extensive legal research, and determined that "[d]efendant's *pro se* filing was legally sufficient on its face and did not require any amendments." At the second-stage hearing on the State's motion to dismiss the postconviction petition, postconviction counsel confirmed that the constitutional issue that had been raised in the petition was the lack of effective assistance of counsel and there were no other issues he was raising. The trial court found the petition was sufficient to raise the constitutional issue of lack of effective assistance of counsel and denied the State's motion to dismiss.

¶ 19    On April 16, 2014, the trial court conducted a third-stage evidentiary hearing on defendant's postconviction petition. Defendant testified that he and his trial counsel, Carper, had not discussed a guilty plea until the morning of the second day of trial and the State had not offered any plea deal. Sweet testified that on the morning of December 4, 2002, he was rushed from the jail to the courthouse earlier than he was originally scheduled to appear because Carper wanted to meet with him. Carper told him that the judge wanted to sentence him to 20 years of imprisonment and the State would not offer any plea bargain because the prosecutor wanted defendant to get a life sentence. Carper told defendant that the judge felt sorry for him. Defendant indicated that Carper did not indicate anything about an "open plea." Defendant testified:

> "I decided to plead guilty because she basically told me there was no defense in my, in my case, and there is. *** I sat there and argued and told her, 'Yes, we do.' 'Call these witnesses and these witnesses.' 'We have a defense.' "

¶ 20    Defendant testified that he "vaguely" understood that his opportunity at trial to put on evidence had not yet occurred. He did not understand what the judge had meant when he asked defendant whether he had been threatened or promised anything in relation to entering a guilty

plea. He had only read the written guilty plea to where his name was stated and then he was rushed into the courtroom and did not read the remainder of the document before signing it in front of the trial judge. During the guilty plea hearing, defendant was under the impression that he was pleading guilty in return for a 20-year sentence. He did not understand the judge's question about promises made in relation to his guilty plea, and he did not say anything because Carper told him "to keep it hush-hush and just go along with the Court, keep [his] mouth shut, and everything would be all right." He went along with what Carper told him to do because she gave him the impression that she would not put on a defense for him at trial and if he did not plead guilty, then he would likely get a life sentence. He tried to tell Carper that he had a defense because he did not do anything wrong, but Carper responded, "Well, I'm not gonna do it" and just threw her hands up, leaned back, and stared at him. Defendant acknowledged that he had responded, "Yes, sir" to the trial court question of whether he committed the offense and understood the sentencing range because Carper had instructed him to just go along with the trial court. He did not learn that he did not have an agreement for a 20-year sentence until the trial court sentenced him to 50 years of imprisonment.

¶ 21      Defendant also testified as to his claim of a lack of investigation into his case. He indicated he did not know the timing for or procedures of the investigator and had relied on Carper to facilitate the investigation. Defendant was not questioned about his allegations that Carper had found him and his case "too repugnant" to be able to provide effective assistance of counsel.

¶ 22      Carper testified that she and defendant had discussed the evidence and had discussed "everything about the case for many hours and numerous times." According to Carper, after the first day of trial, the evidence against defendant was "pretty overwhelming," and defendant "decided to end the jury trial" and enter an "open plea." She explained to defendant what an open plea meant numerous times. She testified that she did not tell defendant the judge had promised him a 20-year sentence or that there was a tacit understanding to that effect with the judge, indicating "there is no way that that existed and no way that I told that to him." She did not tell defendant that if he refused to plead guilty, he would get life in prison. Carper testified that she would have put on a defense if the trial had continued and she "had been preparing for that for four months." She felt prepared for trial. According to Carper, she and defendant had even sat down to prepare a statement in allocution, but he threw it away when he was about to give it. Carper also testified that she did not promise defendant a specific sentence or threaten him. She indicated that during her representation of defendant, "[h]e was willing to not only ask questions but to argue about the issues in the case." She indicated that she did not coerce defendant into pleading guilty and stated that it was hard for her to get him to take her advice and she doubted that she could have coerced defendant into doing anything.

¶ 23      Carper further testified that she did not review the court file prior to the postconviction evidentiary hearing because "it was so big." The part that she did read about the "accusations and lies told about [her] personally" was "so offensive" to her that she did not want to read any more. Carper indicated, "[y]ou have to understand that this has also been the subject of appeals and an ARDC complaint that was unfounded where the same lies and insults were said, so I am really not interested in reading the whole court file again."

¶ 24      Carper testified that defendant had wanted to bring in witnesses to testify about the prior DCFS complaints that had been made against Faith's mother. Carper's decision was that those witnesses had no relevance to defendant's murder trial, "so those witnesses were not gonna be called." Carper contemplated calling a medical expert but decided against doing so because

"the testimony would have been very damaging." Carper's defense for defendant at the point the trial stopped consisted of her cross-examining the State's witnesses, with the defense's case-in-chief depending on how the State had finished with their evidence.

¶ 25    On May 9, 2014, the trial court issued its decision and denied defendant's postconviction petition. The trial court found that defendant failed to sustain his burden of demonstrating that his plea had been coerced, that he was promised a 20-year sentence in exchange for a guilty plea, or that Carper refused to put on a defense for him. The trial court found Carper to be credible and found defendant not credible. The trial court found that defendant failed to make a substantial showing that Carper provided ineffective assistance. Defendant appealed the denial of his postconviction petition.

¶ 26                    C. Section 2-1401 Petition for Relief From Judgment

¶ 27    Subsequently, on March 3, 2016, defendant filed a *pro se* section 2-1401 petition for relief from judgment. In the petition, defendant alleged that Carper had coerced him into pleading guilty by telling him that he would get a life sentence if he did not plead guilty and would receive a 20-year term of imprisonment if he did plead guilty. Defendant further alleged that Carper had written him a letter on January 5, 2003, and he had requested his postconviction counsel to submit the letter as evidence during postconviction proceedings but his postconviction counsel failed to do so. In the letter she sent to defendant, Carper had stated:

> "Remember that Judge Henderson has promised that there will be no life sentence. That makes me believe that he will fashion a sentence that will someday allow you to resume a positive life."

¶ 28    In the section 2-1401 petition, defendant alleged that he did not receive a reasonable level assistance from his postconviction counsel because his postconviction counsel did not use the letter as evidence, nor did his postconviction counsel use the letter to impeach Carper's testimony at the postconviction evidentiary hearing. Defendant also alleged that Carper committed perjury during the postconviction evidentiary hearing and if the circuit court had known of the letter, his postconviction petition would not have been denied. Defendant requested the appointment of counsel and attached an affidavit attesting to the truth of the statements in "the foregoing petition for a successive post conviction petition." The trial court denied defendant's request for the appointment of counsel, stating in its written ruling, "[t]here is no statutory basis for appointment of counsel in a 2-1401 motion proceeding." Also in its written ruling, the trial court acknowledged that the State had not responded to defendant's section 2-1401 petition, indicated that a trial court may dismiss a section 2-1401 petition *sua sponte* if the facts alleged failed to state a legal basis for relief, noted that a section 2-1401 proceeding was not an appropriate forum for raising an ineffective assistance of counsel claim, and summarily dismissed the section 2-1401 petition because it was alleging the ineffective assistance of postconviction counsel. Defendant appealed.

¶ 29    Defendant's two appeals have been consolidated by this court.

¶ 30                                      ANALYSIS
¶ 31                    A. Denial of Defendant's Postconviction Petition
¶ 32    On appeal, defendant argues this court should reverse the denial of his postconviction petition and remand for further proceedings because his postconviction counsel did not

provide a reasonable level of assistance. According to the defendant, his postconviction counsel failed to present any evidence regarding his postconviction claim that his trial counsel, Carper, was ineffective at the time defendant entered his guilty plea in that Carper was harboring a *per se* conflict of interest. The State argues that the record shows that postconviction counsel provided reasonable assistance and postconviction counsel was not required to advance defendant's frivolous claim that Carper had represented defendant while operating under a *per se* conflict of interest.

¶ 33 A criminal defendant's sixth amendment right to the effective assistance of counsel includes the right to representation that is conflict-free. *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008). However, there is no constitutional right to the assistance of counsel in postconviction proceedings; the right to counsel is wholly statutory, and petitioners are only entitled to the level of assistance provided for by the Post-Conviction Hearing Act (Act), which is a reasonable level of assistance. 725 ILCS 5/122-1 *et seq.* (West 2012); *People v. Suarez*, 224 Ill. 2d 37, 42 (2007). Trial counsel and postconviction counsel serve different roles—a defendant in postconviction proceedings already has been stripped of the presumption of innocence and, therefore, the right to counsel in postconviction proceedings is not constitutionally required. *People v. Owens*, 139 Ill. 2d 351, 364-65 (1990).

¶ 34 In determining whether a defendant received ineffective assistance of counsel based on an alleged conflict of interest, we first resolve whether counsel labored under a *per se* conflict. *Hernandez*, 231 Ill. 2d at 142. If a *per se* conflict in defense counsel representation exists, defendant is not required to show that counsel's actual performance was affected by the conflict, meaning defendant is not required to show actual prejudice. *Id.* at 143. Instead, a *per se* conflict is grounds for an automatic reversal. *Id.*

¶ 35 A *per se* conflict of interest is one in which facts about a defense attorney's status gives rise to a disabling conflict, such as when a defendant's attorney has ties to a person or entity that would benefit from an unfavorable verdict for defendant. *Id.* The very nature of the *per se* conflict rule precludes inquiry into the specific facts of a case because the status of the defendant's attorney itself dictates the application of the *per se* rule. *Id.* at 150. Our supreme court has held that a *per se* conflict of interest exists where defense counsel (1) has a prior or contemporaneous association with the victim, prosecution, or entity assisting the prosecution; (2) contemporaneously represents a prosecution witness; or (3) was a former prosecutor who had been personally involved in the prosecution of the defendant. *Id.* at 143-44.

¶ 36 Distinguishable from a *per se* conflict of interest is an actual conflict of interest. An actual conflict of interest exists where the defendant can point to a specific defect in his counsel's strategy, tactics, or decision making that was attributable to a conflict. *Id.* at 144. If the trial court has not been apprised of the potential conflict, then a reversal of a conviction will only be had upon a showing that an actual conflict of interest adversely affected counsel's performance. *People v. Spreitzer*, 123 Ill. 2d 1, 18 (1988).

¶ 37 Here, defendant requests this court to, as a matter of first impression, find that a *per se* conflict of interest exists where trial counsel represented a defendant who is, or whose cause is, so repugnant to the attorney that the attorney-client relationship or the attorney's ability to represent the defendant is likely to be impaired. This court need not address defendant's contention that such a scenario creates a *per se* conflict because the record indicates that Carper was not acting either under a *per se* or an actual conflict of interest in regard to her

personal feeling about defendant or the nature of his case during her representation of defendant.

¶ 38      The record indicates that Carper filed a motion to withdraw from representing defendant during postplea proceedings. In her motion, she indicated that she could no longer represent defendant because she found his allegations pertaining to her performance, as alleged in his *pro se* posttrial motions, to be so repugnant that her continued representation of him would violate Illinois Rule of Professional Conduct 6.2(c). There is no indication of a conflict of interest prior to trial, during trial, or during the guilty plea hearing, and Carper withdrew as defendant's counsel as soon as the conflict arose when defendant filed his *pro se* postplea motion that alleged Carper's ineffective assistance of counsel. Consequently, defendant's postconviction counsel did not provide unreasonable assistance to defendant during postconviction proceedings by failing to present evidence of defendant's claim that Carper was ineffective for harboring a *per se* conflict of interest where the record shows that a conflict of interest did not exist. See *People v. Greer*, 212 Ill. 2d 192, 205 (2004) (providing that postconviction counsel is not required to advance a frivolous claim or a claim that is patently without merit).

¶ 39      We also reject defendant's claim that postconviction counsel was ineffective for initially adopting at the second stage of the postconviction proceeding defendant's *pro se* claim of Carper's ineffective assistance as his trial counsel due to an alleged conflict of interest and then failing to present any evidence in support of that claim during the third-stage evidentiary hearing. At the evidentiary hearing, Carper testified that she was prepared to represent defendant at trial and that her conflict in representing defendant did not arise until after defendant filed his *pro se* postplea motion of ineffective assistance of counsel containing what Carper felt were unfounded lies and insults toward her performance as his counsel. Defendant's claim that Carper harbored strong negative feelings toward him that biased her against him to the point of creating a *per se* conflict of interest, from almost inception of her representation of him, was not proven. Notably, defendant does not indicate what, if any, evidence postconviction counsel could have or should have presented in support of defendant's speculative claim that his trial counsel was operating under the alleged *per se* conflict during her representation of him. Even more notable is the fact that the record shows that Carper withdrew from representing defendant when the conflict arose. Under the circumstances of this case, we find no deficiency in postconviction counsel's representation of defendant and conclude that defendant received the reasonable level of assistance afforded under the Act. Therefore, we affirm the trial court's denial of defendant's postconviction petition.

¶ 40                    B. Dismissal of Defendant's Petition for Relief From Judgment

¶ 41      Defendant also argues on appeal that the circuit court erred by dismissing his section 2-1401 petition. Defendant contends that his section 2-1401 petition properly raised the following three claims: (1) his postconviction petition would not have been denied if the circuit court had known of Carper's letter; (2) the letter indicated that Carper testified falsely at the postconviction evidentiary hearing regarding whether the judge made a promise regarding defendant's sentence; and (3) his postconviction counsel provided unreasonable assistance where postconviction counsel was well aware of Carper's letter but postconviction counsel failed to present the letter during postconviction proceedings. The State argues, among other

things, that defendant's section 2-1401 petition failed to show the existence of a meritorious claim or defense.

¶ 42    Section 2-1401 of the Code sets forth a statutory procedure for the vacatur of judgment that is more than 30 days old. 735 ILCS 5/2-1401 (West 2012). Relief under section 2-1401 is provided where a petitioner proves by the preponderance of the evidence (1) the existence of a meritorious defense or claim that would have precluded the entry of a judgment in the original action, (2) due diligence in presenting this defense or claim in the original action, and (3) due diligence in filing the section 2-1401 petition for relief. *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220-21 (1986). For the purposes of section 2-1401, a meritorious defense involves an error of fact or the existence of a valid defense that was not presented to the trial court that would have prevented the entry of the judgment. *People v. Pinkonsly*, 207 Ill. 2d 555, 565-66 (2003). If the facts alleged in a section 2-1401 petition cannot state a legal basis for the relief requested, the petition may be challenged at any time, even on appeal. *People v. Vincent*, 226 Ill. 2d 1, 8-9 (2007). We review the dismissal of a section 2-1401 petition presenting purely legal claims *de novo. Id.* at 18.

¶ 43    We agree with the State that the content of Carper's letter does not show the existence of a meritorious claim or defense. The letter merely states that the judge promised no life sentence and that Carper believed that the judge would "fashion a sentence that will someday allow [defendant] to resume a positive life." Defendant did not receive a life sentence and the letter does not promise a particular sentence. Defendant was sentenced to a 50-year term of imprisonment. Presenting Carper's letter at sentencing or in the postconviction proceedings would not have precluded the entry of the judgment, sentence, or a denial of defendant's postconviction petition.

¶ 44    Defendant also argues that the trial court erred by failing to appoint him counsel to represent him on his section 2-1401 petition. The trial court had discretion in appointing counsel but chose not to do so. See *People v. Kane*, 2013 IL App (2d) 110594, ¶ 21 (while the appointment of counsel is not expressly prohibited in section 2-1401 proceedings, there is no statutory basis for the appointment of counsel in section 2-1401 proceedings and if the trial court is not required to, or prohibited from, taking an action, the court will be said to have discretion to do or not do that action). A trial court commits error when it refuses to exercise discretion based on the erroneous belief that it does not have the power to exercise its discretion. *Id.*

¶ 45    Defendant argues that the trial court abused its discretion by failing to exercise its discretion because "the court failed to recognize that it had discretion to appoint counsel." In denying defendant's request for the appointment of counsel for representation on his section 2-1401 petition, the trial court simply stated, "[t]here is no statutory basis for appointment of counsel in a 2-1401 motion proceeding." The statement does not support defendant's claim that the trial court did not realize it had discretion to do so but, rather, merely indicates that the trial court knew defendant did not have a statutory right to counsel. There is no affirmative indication in the record to support defendant's claim that the trial court did not know it had the discretion to appoint counsel just because the trial court correctly indicated that defendant did not have a statutory right to counsel "in a 2-1401 motion proceeding." See *In re Jonathon C.B.*, 2011 IL 107750, ¶ 72 (presuming that a trial judge knows and follows the law unless the record affirmatively indicates otherwise).

¶ 46    For the foregoing reasons, we also affirm the trial court's dismissal of defendant's section 2-1401 petition for relief from judgment.

¶ 47                                CONCLUSION
¶ 48    The judgments of the circuit court of McDonough County are affirmed.

¶ 49    Affirmed.