2019 IL App (1st) 160443

No. 1-16-0443

Opinion filed June 11, 2019

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 99 CR 13829 |
| | ) | |
| CHARLES DIXON, | ) | Honorable |
| | ) | Mary M. Brosnahan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Pucinski concurred in the judgment and opinion.
Presiding Justice Mason dissented, with opinion.

**OPINION**

¶ 1    A self-represented criminal defendant should have access to the same trial materials as his or her counsel, with redactions required by law. That just principle underlies this case.

¶ 2    Charles Dixon filed a postconviction petition alleging a long list of constitutional violations that he claimed occurred at his trial. The trial court docketed his petition and appointed counsel. Extensive delay in the proceedings as well as postconviction counsel's decision to raise only two claims on Dixon's behalf eventually led Dixon to reluctantly seek to represent himself,

which the trial court allowed. After lengthy litigation about Dixon's access to his trial attorney's file, the State moved to dismiss the petition, and the trial court granted its motion.

¶ 3    Dixon argues that the trial court erred when it allowed him to proceed *pro se* without access to his trial attorney's file. He contends that the trial court's denial of access rendered his waiver of postconviction counsel invalid. At oral argument, counsel confirmed Dixon's position that the trial court's denial of access to his trial counsel's file, regardless of the sufficiency of his waiver of postconviction counsel, constituted "reason alone for this court to remand for second stage proceedings." Also at oral argument, the State conceded that Dixon's trial counsel's file should be turned over to him after appropriate redactions. Dixon also presses two of the claims from his postconviction petition on the merits, arguing that he has made a substantial showing of his trial counsel's ineffectiveness.

¶ 4    Given the clarification of the parties' positions at oral argument, we no longer need to determine whether Dixon validly waived the assistance of postconviction counsel. Instead, we find, as the parties now agree, that depriving Dixon of his requested access to his trial counsel's file constitutes error. We reverse and remand for new second-stage proceedings.

¶ 5                                    Background

¶ 6    Twenty years ago, Charles Dixon went into Iona Feldman's shoe repair shop and beat him with a stick. Dixon took Feldman's wallet and left. About three months later, Feldman died from his injuries. Dixon was charged with, among other offenses, first degree murder and aggravated battery. Before trial, defense counsel filed a motion to suppress statements that Dixon had given to police based, in part, on a claim that the statements had been coerced when the police officers involved had "misadministered the dosages" of Dixon's pain medications,

rendering the statements involuntary. At the motion hearing, two Chicago police detectives denied that they had given Dixon any medication. Trial counsel presented no witnesses and offered no argument. The trial court denied the motion.

¶ 7 The case proceeded to a jury trial. During opening statements, defense counsel made reference to the possibility that witnesses implicated Dixon only after "posters of a reward went up." Counsel presented no evidence of a reward. The jury found Dixon guilty of both murder and aggravated battery.

¶ 8 Trial counsel filed a motion for a new trial. Dissatisfied with trial counsel's representation, Dixon asked that counsel be discharged. The court granted Dixon's request and allowed him to represent himself.

¶ 9 Dixon then filed his own motion for a new trial, repeating many of the allegations in counsel's motion. Attached to Dixon's motion, however, was a document labeled "Petition for Post-Conviction Relief With Memorandum of Law." That document alleged ineffective assistance of trial counsel, including counsel's failure to present evidence at the hearing on the motion to suppress statements and counsel's failure to support, with evidence, the claim about a reward.

¶ 10 Because Dixon had yet to be sentenced, the trial court treated Dixon's "Post-Conviction" petition as an addendum to his motion for a new trial. The court held a hearing as provided in *People v. Krankel*, 102 Ill. 2d 181 (1984), at which trial counsel testified. The trial court denied Dixon's motion for a new trial.

¶ 11 The trial court sentenced Dixon to consecutive prison terms of natural life for first degree murder and 30 years for aggravated battery. Dixon appealed.

¶ 12    On direct appeal, Dixon raised several issues, all aimed at the posttrial and sentencing proceedings. We agreed that his natural life and 30-year sentences should be modified to run concurrently, but otherwise affirmed the judgment. *People v. Dixon*, 366 Ill. App. 3d 848, 856-57 (2006).

¶ 13    In September 2005, the direct appeal still pending, Dixon filed the postconviction petition now before us. His initial petition contained seven allegations of ineffective assistance of trial counsel and about 300 pages of exhibits. This petition appears nearly identical to the petition attached to Dixon's *pro se* motion for a new trial. After the mandate issued in the direct appeal, the trial court docketed the petition and appointed counsel.

¶ 14    Counsel first appeared in May 2007, and so began a lengthy series of continuances. By September 2009, counsel had read only the transcripts and indicated "a potential issue" to raise on Dixon's behalf. Counsel explained to the court that she "would like to take a look at [the trial file] before deciding exactly how to proceed with that particular issue" and asked for what became another series of continuances.

¶ 15    Counsel reported to the trial court in January 2010 that she had "gone through much of [the trial file]" and spoken with the original investigator on Dixon's case. Based on the conversation with the investigator, counsel needed to examine the trial file in greater depth.

¶ 16    Nothing more happened until April 2010. Counsel explained to the court that, in a phone call with Dixon, he had told her that he filed a motion to proceed *pro se*. The court had not received it and ordered Dixon to appear. On April 29, Dixon confirmed that he wished to represent himself.

¶ 17    The next day, the trial court allowed Dixon time to speak with his brother about his decision to represent himself and admonished Dixon on the perils of self-representation. The court learned that Dixon, 55 years old, had earned both a GED and associates degree. Dixon said that he was taking blood pressure and pain medications, and neither affected his ability to think clearly. Dixon denied ever receiving treatment or medication for mental health.

¶ 18    The trial court told Dixon that the public defender's office would be far better than he would be at navigating postconviction proceedings and conducting investigations. The court warned Dixon that, if he represented himself, it would not appoint investigators, order the Department of Corrections to grant him extra library time, or appoint standby counsel. Dixon, concerned about his access to the trial file and other documents, interjected:

> "DIXON: Let me ask you one question. This is the question I want to ask you, like the trial attorney records, and all of that stuff that was supposed to have been used in my trial, I got a list of documents, police reports, general progress notes, stuff that they used, and stuff that the State used, will I get a chance to at least get that, because that['s] going to be—
>
> THE COURT: I will have the Defense redact the reports that they have and I would get you copies of that. When I say redact, that means you don't get home addresses and phone numbers of witnesses or individuals.
>
> [DIXON]: No, I don't need that. I just—[The report of proceedings attributes this statement to the Assistant Public Defender. We agree with the State's representation in its brief that, in context, Dixon spoke].

THE COURT: They get blacked out. The information that you can't have would be blacked out.

DIXON: But other than that, I get everything they got access to or had access to, right?

THE COURT: I don't know exactly what all those documents are, so possibly we would have to have a discussion about some of that. I don't know.

DIXON: Well, as long as I can get the documents and the stuff from the State, you know, I need that they get, any witnesses receive any special treatment for their testimony, you know, any time cuts.

THE COURT: Let's see what you are proceeding on. Is there already a document filed by Mr. Dixon?

DIXON: I got it right here. I didn't never get a chance because the law libary [*sic*] didn't call me over there to make copies.

After a brief interruption where the parties discussed the case's procedural history, the court's colloquy with Dixon continued:

THE COURT: You are indicating you want to file an amended petition? All right. How much time do you need to get that on file?

DIXON: Well, I got to get the documents. Once I get the documents, I would imagine that the documents come right away, about four or five months, you know, given I got this neck problem.

THE COURT: All right. Here's what I'm going to do. Why don't I hold it over. Defense, how much time would it take for you to have your redacted documents together?

MS. PAHL: It would depend, [Y]our Honor, on exactly what documents. If Mr. Dixon already has the transcript, the common law record, I could—I have in my office from the appeal, I could redact that. That would be fairly simple.

The trial attorney's files, which I have examined in this case, are two very large boxes of documents. That would be an enormous project. I do not know if all of that would be relevant to all the claims.

THE COURT: All right. Well, first what I'm going to do is why don't you review your petition that you have on file, what it is you are looking for, and you can tell me what it is you want from them.

DIXON: Well, I really want all the stuff she just named. I got the stuff right here."

The court ultimately told postconviction counsel to prepare a copy of the common law record and continued further discussion of discovery until the assigned assistant state's attorney (ASA) could be present "in case they have any objections" to the production of documents.

¶ 19    The trial court reminded Dixon that it was "a really bad decision" to represent himself, but concluded that he understood the consequences and granted the public defender's office leave to withdraw and allowed Dixon to proceed *pro se*.

¶ 20    In late May 2010, Dixon requested access to trial counsel's entire file, including police reports, lab reports, four of the State's trial exhibits, handwritten statements from three trial witnesses, and many other documents to which he claimed trial counsel had had access.

¶ 21    The State's response, relying on *People ex rel. Daley v. Fitzgerald*, 123 Ill. 2d 175 (1988), argued that Dixon had failed to show "good cause" for the discovery. The State characterized his request as "a wide ranging search to confirm mere speculation." During the hearing on the motion, the court asked Dixon to explain the relevancy of each request.

¶ 22    The court granted discovery of the general progress reports related to one witness's interview with police and of that witness's and two others' handwritten statements, but denied the remainder. As to trial counsel's file, the trial court found that the contents constituted work product and that there had been "nothing other than the possibility that it would lead [Dixon] in a direction to develop a postconviction, and again, that's not the scope of discovery. The discovery is an order to [shore] up a claim that you already have." The trial court denied Dixon's motion to reconsider.

¶ 23    About three-and-a-half years later, Dixon filed an amended postconviction petition, which the State moved to dismiss. The motion remained pending for more than a year. In all, Dixon's petition remained pending for 11 years from the date of the initial filing. During that time a host of factors contributed to the delay. Many continuances arose due to lengthy lockdowns at Dixon's Illinois Department of Corrections facility, resulting in limited access to the law library. The Departments of Corrections, both Illinois and Cook County, misplaced Dixon's legal materials at least twice. Dixon filed two motions for substitution of judge, both of

which were denied. And, as we have outlined, the parties engaged in extensive litigation about Dixon's access to discovery materials.

¶ 24    Ultimately, the trial court dismissed Dixon's postconviction petition. Dixon sought reconsideration, which the trial court denied on January 20, 2016. That same day, Dixon filed his notice of appeal.

¶ 25                                        Analysis

¶ 26    Dixon's brief contends that "[t]he trial court erred when it granted Dixon's motion to proceed *pro se* at the second stage but then handicapped him by refusing to allow access to the documents used by the attorney who previously represented him." He spends the bulk of his argument claiming that the trial court's denial of access rendered his waiver of postconviction counsel invalid. He also argues, as an alternate theory, that the trial court's rulings that the trial file constituted discovery and work product "were erroneous." He claims that his counsel's file cannot be discovery because the contents had already been tendered and the file cannot be considered work product because it came from his own attorney. On either basis, he asks us to afford him full access his counsel's trial file and to remand for second-stage proceedings. Dixon does not oppose redactions as required by *People v. Maldonado*, 193 Ill. App. 3d 1062, 1068 (1989) (allowing court to bar disclosure of new witness addresses to counsel where "substantial risk" of physical harm, intimidation, annoyance, or embarrassment outweighing usefulness of disclosure).

¶ 27    The State frames its response similarly. In the first part of its brief on this issue, the State argues that the trial court did not abuse its discretion by allowing Dixon to proceed *pro se*. In the second part, the State contends that "the [trial] court's decisions regarding discovery were

correct" because the trial file constituted discovery or was otherwise protected by the work-product doctrine. Because of the State's position that the trial file constituted discovery, the State argued that Dixon had failed to show "good cause" for receiving the file.

¶ 28 The trial court offered two reasons for denying Dixon access to his trial counsel's file: (i) Dixon had shown "nothing other than the possibility that it would lead [him] in a direction to develop a postconviction" and, in the court's view, postconviction discovery means "to [shore] up a claim that you already have," not to search for new claims, and (ii) the contents of the file constituted work product. The State repeats these arguments in its brief. We find both arguments unpersuasive; as a substantive matter, Dixon was entitled to the contents of his trial counsel's file.

¶ 29 The Post-Conviction Hearing Act (or Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a mechanism by which defendants can seek remedy for alleged constitutional violations that occurred during their trials. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Proceedings under the Act take place in three stages. *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). At the first stage, the trial court reviews the petition and only may dismiss a frivolous or patently meritless petition. *Id.* at 99-100. Should a petition survive the first stage, it continues to the second stage where counsel may be appointed and the State can move to dismiss. *Id.* at 100. If the State's motion to dismiss is denied, or no motion to dismiss filed, the trial court conducts an evidentiary hearing on the merits. *Id.*

¶ 30 The Act straddles the civil-criminal divide, leading our supreme court to describe it as *sui generis*, meaning "of its own kind." *Daley*, 123 Ill. 2d at 181. So, neither the civil discovery rules nor the criminal discovery rules apply in postconviction proceedings. *Id.* at 181-82. *Daley*

dealt specifically with discovery depositions, and in that context, a postconviction petitioner must show "good cause" for the request. *Id.* at 183-84. The court has since applied the "good cause" requirement more generally. *People v. Johnson*, 205 Ill. 2d 381, 408 (2005) (evidence deposition); *People v. Fair*, 193 Ill. 2d 256, 264-65 (2000) (confession and witness interviews). A trial court's decision to grant or deny a postconviction discovery request will not be disturbed absent an abuse of discretion. *Johnson*, 205 Ill. 2d at 408.

¶ 31     Initially, we find it odd to think of trial counsel's file as "discovery" when the party requesting it is counsel's own client. Traditionally, the goal of postconviction discovery is to allow a petitioner to engage in a limited search for new information. *Cf. Daley*, 123 Ill. 2d at 184 (discussing possibility that discovery may not be necessary if information already available elsewhere). Dixon's counsel confirmed this view by conceding at oral argument that he is not alleging error as to any information from a third party source that is not already in the trial file. By contrast, the information in trial counsel's file would not have required the production of new information. While Dixon may not have personally viewed some of the materials in the trial file, the information had already been discovered. That said, accepting the characterization of the trial file as "discovery," the trial court's reasons for denying access to it were insufficient.

¶ 32     The trial court denied Dixon access, in part, because the court believed he was "fishing." We disagree, and find our supreme court's decision in *Fair* to be instructive. The petitioner in *Fair* sought documentary evidence from the State's trial file, including a confession to criminal conduct from the judge who presided over the petitioner's trial and other witness statements. *Fair*, 193 Ill. 2d at 259, 263-64. The trial court denied petitioner's request. *Id.* at 263. The State argued, as it does here, that the petitioner had not shown good cause for the discovery request

because nothing in his petition showed a nexus between the postconviction claim and the discovery. *Id.* at 266.

¶ 33 The supreme court, rejecting that argument, stressed that it would put postconviction petitioners in "an impossible dilemma." *Id.* The State's theory, both in *Fair* and here, would allow a postconviction petitioner "to seek out evidence that there is a nexus between [the evidence requested] and petitioner's trial only if he [or she] already possesses such evidence." *Id.* at 266-67. That position puts Dixon to the impossible task of using the evidence he is requesting to prove his need for the evidence. The circularity of this argument jeopardizes the availability of information, particularly to an indigent petitioner.

¶ 34 The State's argument becomes even more troubling on consideration of the facts. Postconviction counsel's initial review of the trial file appears to have been fruitful. At the time that the trial court accepted Dixon's waiver, postconviction counsel already had represented to the court that she "had access to the trial attorney's file," that she had "gone through much of it," and that she had also "spoken with the original investigator on the case," which led her to ask for additional time to review the file. Dixon later told the court that before postconviction counsel's withdrawal, he and counsel had agreed to raise one claim of ineffective assistance of trial counsel and one claim of ineffective assistance of appellate counsel. We can assume that postconviction counsel's determination that two issues had merit came from counsel's examination of the trial file, and not the trial record, where the issues would have been either *res judicata* or waived. See *People v. Holman*, 2017 IL 120655, ¶ 25 ("[I]ssues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*; issues that could have been raised,

but were not, are forfeited."). We cannot say, as the trial court did, that Dixon's desire to examine the file constitutes a "fishing expedition" under these facts.

¶ 35    The trial court also found, and the State argues in its brief, that the trial file cannot have been turned over because of "notes or memos concerning strategy," which the State and the trial court characterize as "work product." We find this argument unavailing.

¶ 36    The work-product doctrine arises from the recognition that lawyers need a degree of privacy when preparing a client's case. *People v. Spiezer*, 316 Ill. App. 3d 75, 80-81 (2000) (discussing *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)). The doctrine protects a client from "unnecessary intrusion by opposing parties and their counsel." (Internal quotation marks omitted*.) Id.* That protection "facilitate[s] the flow of information leading to theories and strategies to be employed by the attorney at trial." *Id.* at 88. The doctrine provides a shield behind which an attorney can "seek, on his [or her] own, information about the case that he [or she] could not obtain from his [or her] adversary through the discovery process." *Id*.

¶ 37    The work-product doctrine is not absolute. *Id.* Even when the opposing party seeks information traditionally protected by the work-product rule, the court must strike a balance "between the need to accord protection to work that is performed on the case *** and the need to ensure that the trier of fact will be exposed to the relevant facts of the case and necessary interpretations of the evidence." *Id.* at 88-89. In addition to that balancing, the work-product doctrine can be waived. *People v. Grier*, 90 Ill. App. 3d 840, 848 (1980). In the analogous context of attorney-client privilege, a defendant waives his or her privilege by alleging counsel's ineffectiveness. *People v. O'Banner*, 215 Ill. App. 3d 778, 793 (1991).

¶ 38 We have been unable to find, and the parties have not cited, any case applying the work-product doctrine to a client's own access to his or her counsel's file while he or she litigates a postconviction petition without counsel. But, we find sufficient guidance in the principles behind the work-product doctrine more generally.

¶ 39 We start with the purpose of the work-product doctrine—to prevent interference with trial preparation by *opposing* parties. That concern evaporates when, like here, Dixon requests access to his own counsel's file. Trial counsel had long-since gathered the information and the "flow of information" has already stopped. One cannot label Dixon's access to his own file as "interference." And, any information that counsel collected would have been conveyed to Dixon as his counsel prepared for trial; indeed, trial counsel's testimony at the posttrial *Krankel* hearing reveals that Dixon and his counsel discussed trial strategy and the status of counsel's investigations. While Dixon may not have laid his eyes on every document, the substance of trial counsel's file had been largely revealed to Dixon as he and his counsel prepared for trial.

¶ 40 We also observe that Dixon's request for the trial file cannot be thwarted by the work-product doctrine, given the nature of his ineffectiveness claims. The work-product doctrine allows defense counsel to freely develop trial strategy, and Dixon has called trial counsel's strategy decisions directly into question by alleging ineffectiveness. The trial file may be the best place for Dixon to look to determine which of his counsel's strategic decisions can be challenged in a postconviction petition.

¶ 41 Even if the work-product doctrine applied, we would strike the balance discussed in *Spiezer*—between the protection of counsel's work and the trial court's need for full factual development—in favor of disclosure. Dixon's trial is over, and his postconviction claims

necessarily depend on facts outside of the trial record. He must substantiate those claims with facts not previously known, which he cannot do without the complete file. Fully protecting his counsel's strategic decisions and development of trial theories is of little moment. The work-product doctrine, even if it applies, simply does not bar Dixon's access to his own counsel's file.

¶ 42 We are satisfied that the Illinois cases describing the work-product doctrine point us to the right answer. But we note that the question of work product *vis-à-vis* client access to his or her counsel's file during postconviction proceedings has come up in other jurisdictions. Many courts agree that the work-product doctrine "is meant to protect an attorney, but not from his [or her] own former client." *Hiatt v. Clark*, 194 S.W.3d 324, 329 (Ky. 2006) (citing *Spivey v. Zant*, 683 F.2d 881 (5th Cir. 1982), and *United States v. Dupas*, 14 M.J. 28 (C.M.A. 1982)).

¶ 43 We also look to the law governing lawyers, and the State's position at oral argument confirmed this body of law as a source for guidance. The Illinois Rules of Professional Conduct provide that a lawyer shall not withdraw from employment until the lawyer has taken reasonable steps to avoid foreseeable prejudice to the rights of the client, including delivering to the client all papers and property to which the client is entitled. Ill. R. Prof'l Conduct (2010), R.1.16(d) (eff. Jan. 1, 2010). The Attorney Registration and Disciplinary Commission appears to take a broad view of a client's entitlement to files when an attorney is terminated, finding misconduct in many cases where the attorney failed to return the entire file in a reasonable amount of time. *E.g.*, *In re Kink*, No. 96PRO420 (Hearing Board Nov. 4, 1997), *enforced*, Ill. S. Ct., M.R. 14306 (Jan. 29, 1998). We do not mean to suggest that any sanctionable conduct has occurred. We refer to disciplinary proceedings only to emphasize that the ARDC affords a robust interpretation of the rule requiring client access to "papers and property" after discharge of an attorney.

¶ 44    The dissent has offered an extensive recitation of potential problems that could arise from our decision (*infra* ¶ 69). For example, the dissent has suggested that all defendants who think their cases are proceeding too slowly would be entitled to their counsel's file. This, of course, would not be true of defendants who remained represented by counsel. We are dealing with a petitioner who exercised his statutory right to represent himself, a right that takes on constitutional dimension in the trial context.

¶ 45    The dissent also suggests that our decision will result in additional delays, budgetary problems caused by production of documents, storage problems at prisons, and fraudulent alteration of documents by unscrupulous petitioners. No facts in this record suggest the system is going to "strain to the breaking point" because of Dixon's request. If a case presents facts that show the sky has indeed fallen, as the dissent predicts it will, we would evaluate the trial court's reasons for denying access to documents on *those* facts.

¶ 46    That said, some of the dissent's concerns warrant consideration because we can address them without reference to specific facts. The dissent suggests our reasoning would apply to files kept by the State Appellate Defender's Office in cases where a client raises ineffective assistance of appellate counsel (*infra* ¶ 68 n.2). This would not be true in most cases. Where ineffective assistance of appellate counsel is raised, the question of counsel's deficiency turns on an analysis of the relevant law at the time the appeal was briefed. See *People v. Cathey*, 2012 IL 111746, ¶¶ 25-29. Counsel performs deficiently if he or she fails to raise an argument that would have been reasonable to make under the law at the time. *Id.* ¶ 29. Prejudice from appellate counsel's deficient performance depends entirely on the merits of the underlying legal question. *People v. Childress*, 191 Ill. 2d 168, 175 (2000). For example, where a defendant raises

ineffective assistance of appellate counsel for failing to raise ineffective assistance of trial counsel, the ultimate question as to prejudice asks whether the claim of *trial* counsel's ineffectiveness has merit. *Id.*

¶ 47    And so for claims of ineffective assistance of appellate counsel, we are either confronted with pure questions of law or we arrive back to where we are in this case—discussing claims of ineffective assistance of trial counsel—with no need to delve into appellate counsel's files. It also is worth noting that ineffective assistance of appellate counsel claims, in addition to requiring no access to appellate counsel's files, will likely not require access to trial counsel's file either. Appellate counsel can only be ineffective for failing to raise issues that were apparent on the face of the record. See, *e.g.*, *People v. Peeples*, 205 Ill. 2d 480, 514-15 (2002) (State argued defendant failed to raise ineffective assistance of appellate counsel claim because underlying issue was based on facts outside record). Claims that require a deep dive into trial counsel's file necessarily fall outside this category.

¶ 48    The dissent raises the improbable specter of the dishonest petitioner who alters documents after reviewing trial counsel's file. Initially, we note that those concerns exist even before a petitioner has access to his or her counsel's file. At any stage of the proceedings, a petitioner could lie, falsify affidavits, or alter documents already in his or her possession. That is as true in postconviction proceedings as during trials, suppression hearings, and police interrogations. In the postconviction context, if anything that a petitioner claims is belied by the record, the State can challenge it at the second stage in a motion to dismiss or at the third stage with its own evidence. We also do not perceive any additional burden on defense counsel in this regard. Indeed, at the end of the day, if a petitioner's ineffectiveness claim is evaluated at a third-

stage hearing, it is highly likely that defense counsel will be "drag[ged] *** back into the case" to testify anyway. *E.g.*, *People v. Sweet*, 2017 IL App (3d) 140434, ¶¶ 22-24 (describing defense counsel's testimony at third-stage evidentiary hearing). Anything in a self-represented petitioner's documents that does not align with counsel's memory of the case or of the documents produced could be challenged. Once that happens, the trial court can evaluate the credibility of the petitioner's claims, as is its role. See *id.* ¶ 25 (trial court found counsel credible and defendant not credible).

¶ 49    We also note that many of the dissent's practical concerns do not apply to every category of postconviction claims. For example, a petitioner would not necessarily need access to his or her trial counsel's file to successfully raise a challenge to the constitutionality of the statute of his or her conviction based on a new supreme court case or a claim of actual innocence based on newly discovered evidence. An unfortunate irony arises in the dissent's willingness to deprive self-represented petitioners of access to their own trial files in cases where they need it most— challenges to trial counsel's strategic decision-making. In these cases, we are confident in striking the balance in favor of disclosure.

¶ 50    While the dissent's concerns undoubtedly deserve serious consideration in the right case, all of this discussion ultimately amounts to little more than a thought exercise. As to Dixon, the trial court gave only two reasons for denying his request—that he was on a fishing expedition and that the trial file was work product. As we are reviewing the trial court's exercise of its discretion, we evaluate those reasons. Both of the reasons that the court invoked to deny Dixon his trial file were erroneous, and we reverse on that basis.

¶ 51    Our conclusion is bolstered in light of the State's clarification of its position at oral argument. Counsel argued only that the trial court did not abuse its discretion by accepting Dixon's waiver of postconviction counsel. In a lengthy exchange between counsel and Justice Pucinski, the State conceded that Dixon was entitled to his trial counsel's file as a substantive matter:

> "ASA: To be clear, it's the State's position that during the course of this discussion he asked for things from the trial file, actually the entire trial file, which would be everything that his attorney had.
>
> JUSTICE PUCINSKI: And you agree that he should have gotten that?
>
> ASA: Based on the rules of professional conduct, we would agree that he probably should have had access.
>
> JUSTICE PUCINSKI: Okay. And what if that included things that that defense attorney already had collected from the State including, I don't know, reports, statements, affidavits, however this stuff is put into a trial file that they made a deal with a witness.
>
> ASA: Our position would be any document that's contained in the trial file regardless of how they received it, subject to the redaction.
>
> JUSTICE PUCINSKI: Why? A police report?
>
> ASA: No.
>
> JUSTICE PUCINSKI: Why would the arrest report be subject to redaction? It's generated by the State.

ASA: If there's any information, like contact information about the witnesses or something like that.

JUSTICE PUCINSKI: Why would any statements that he made be, that's generated by the State. Why couldn't he have that?

ASA: He could have that.

JUSTICE PUCINSKI: Why would any witness statements or lineup verifications, or any of that stuff, it's all created by the State, by the police, he can have that right?

ASA: If it's in the trial file, yes.

JUSTICE PUCINSKI: Anything that's in the trial file?

ASA: Yes.

JUSTICE PUCINSKI: Okay.

ASA: Subject to the redaction of the personal information of witnesses."

Oral Argument at 27:15-28:40.

We agree with Dixon's argument and the State's modified position at oral argument that the trial court erred when it denied Dixon access to his trial counsel's file. As we have explained, the State's concession comports with the law.

¶ 52    The dissent sees this exchange differently, asserting that because we have "expanded the scope of work product" we have read the State's concession too broadly. *Infra* ¶ 66. First, we disagree with the dissent's characterization of our holding. We are reversing the trial court's second-stage dismissal of Dixon's petition partly because we have found that the contents of his trial counsel's file are *not* work product, at least as to him. It was the trial court that concluded

that the contents of trial counsel's file were work product. To the extent the dissent disagrees with that conclusion, it should agree with us.

¶ 53    Second, we do not read the State's concession, as the dissent suggests, to "bind" the public defender. We simply read it as the State's decision to no longer defend the trial court's denial of access to the trial file on work product grounds. The State, of course, has no power to determine what the assistant public defenders must or must not provide for their clients. But, the State did argue both in the trial court and in its brief before us, that the work product doctrine prevents the production of trial counsel's file. The State's concession as to that point simply bolsters the conclusion we already reached analyzing the relevant law.

¶ 54    We hold that the trial court should have adopted, as nearly as practicable, an open-file policy regarding Dixon's access to his own trial counsel's case file. Dixon's access can be limited only by the need for continued confidentiality of documents that were confidential when disclosed to trial counsel. See Ill. S. Ct. R. 412(i), (j) (eff. Mar. 1, 2001). This limitation requires no more than the trial court already required for production of the common law record: redaction of sensitive information, a task that appears to be routine practice in the trial court when a defendant represents him or herself. See *People v. Pratt*, 391 Ill. App. 3d 45, 47 (2009) (trial court ordered State to redact "all personal information" from discovery when defendant indicated intent to represent himself); *People v. Phillips*, 392 Ill. App. 3d 243, 256 (2009) (same); see also *People v. Trotter*, 2015 IL App (1st) 131096, ¶ 4 (trial court instructed defense counsel, who still represented defendant, to "redact discovery documents" so that defendant could review them himself). Aside from that narrow limitation, Dixon should have access to his trial counsel's case file.

¶ 55   Accordingly, we reverse the trial court's dismissal of Dixon's postconviction petition and remand for further second-stage proceedings, during which Dixon, or any counsel he may have, will have access to his trial counsel's file as we have outlined.

¶ 56   The dissent goes on to conduct lengthy analyses of Dixon's claims, both on *res judicata* grounds (*infra* ¶¶ 70, 119-22) and on the merits (*infra* ¶¶ 70, 123-36). The end result being, according to the dissent, that all of our analysis is unnecessary because Dixon's claims are either barred by *res judicata* or are patently without merit. In doing so, the dissent has essentially invoked a harmless error analysis to reject Dixon's procedural claims.

¶ 57   We are unaware of cases in the postconviction context where a court has excused procedural error because it believes the petition did not have merit. Actually, the cases suggest the opposite. Illinois reviewing courts routinely reverse for second-stage proceedings on the ground that the trial court did not docket a postconviction petition for first-stage review within 90 days—no merits consideration takes place. *E.g.*, *People v. Perez*, 2014 IL 115927, ¶ 29 (affirming appellate court's reversal of first-stage dismissal where trial court entered dismissal order on ninety-first day). Similarly, at the second stage, this court routinely remands for new second-stage proceedings where appointed counsel fails to substantially comply with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017)—again, without any ruling on the merits. *E.g.*, *People v. Carrizoza*, 2018 IL App (3d) 160051, ¶ 21 (remanding for Rule 651(c) compliance and finding, as result, "we need not address defendant's remaining contentions"). That course of action takes on importance here—without Dixon's review of his trial counsel's file, we have no idea what form his petition might take if he chooses to amend it. We cannot say for certain that the claims the dissent would rule on are the ones that Dixon may ultimately raise. So we find our

resolution of the procedural arguments in Dixon's favor eliminates any need to comment on the merits of his postconviction claims.

¶ 58    On this score, the dissent responds that we have somehow altered the scope of second-stage proceedings because second-stage proceedings are to be used only to "clarify and refine claims already raised" and not to be "a launching point for petitioners to attempt to assert new claims" (*infra* ¶ 68). The Post-Conviction Hearing Act does not support this view. The text expressly allows the trial court to permit amendments to a petition at the second stage. 725 ILCS 5/122-5 (West 2016) ("[t]he court may in its discretion make such order as to amendment of the petition"). Often, an amendment includes entirely new claims. See *People v. Johnson*, 154 Ill. 2d 227, 239 (1993) ("The amended petition *** added two additional claims.").

¶ 59    We have held that appointed postconviction counsel's assistance can be unreasonable where counsel fails to amend a petition to include a viable claim. *People v. Schlosser*, 2012 IL App (1st) 092523, ¶ 33 (unreasonable assistance where counsel did not amend the petition to add claim of ineffective assistance of appellate counsel); see also Ill. S. Ct. R. 651(c) (eff. July 1, 2017) (appointed counsel must certify he or she "has made *any* amendments *** necessary for an adequate presentation of petitioner's contentions" (emphasis added)).

¶ 60    Again, the dissent's concerns go beyond the facts. Here, the trial court, at the second stage, had already exercised its discretion to allow Dixon "to assert new claims." Dixon's first petition included 7 claims. Then the trial court allowed Dixon to amend his petition to include 35 claims. As we have already said, there is no way to know whether that amendment is complete unless Dixon has access to his trial counsel's file—access given his previously appointed postconviction counsel. We recognize that Dixon, as a *pro se* litigant, has no entitlement to

special treatment (*People v. Hudson*, 86 Ill. App. 3d 335, 340 (1980)); but neither should he be subjected to affirmatively worse treatment. Our decision does no more than place Dixon in the same position as postconviction counsel—no better, no worse.

¶ 61    We leave the parties with two final thoughts on remand. Dixon himself recognized that "it is a very bad proposition for [him] to be representing [him]self." We wholeheartedly agree. We echo the trial court's admonishment that it is "a really bad decision" for Dixon to continue to represent himself on remand. While the choice of self-representation remains his (*People v. Gray*, 2013 IL App (1st) 101064, ¶¶ 21-22), we urge him to bear in mind the pitfalls of self-representation, many of which he has already experienced.

¶ 62    We also cannot ignore that Dixon's postconviction petition remained pending for nearly 11 years before a ruling on the merits. We acknowledge, and are sympathetic to, both the portion of the delay caused by the pendency of the direct appeal and the need of the public defender's office to balance its caseload and set priorities. We are less sympathetic to the many continuances that postconviction counsel requested, after she had started working on the case, where the only reason for the continuance reflected in the record is the need to review the record or the trial file. Indeed, even the trial court expressed frustration, at one point admonishing postconviction counsel that if progress had not been made a supervisor should accompany her to court. We are cognizant that much of the remainder of the delay largely stems from Dixon's status as a self-represented incarcerated litigant and his own litigation decisions. While we understand the difficulty of litigating from within a prison, we cannot condone the inordinate delay in considering Dixon's petition, much of which he caused himself. We are confident that

the parties will work both conscientiously and expediently to resolve Dixon's postconviction claims on remand.

¶ 63    Reversed and remanded.

¶ 64    PRESIDING JUSTICE MASON, dissenting:

¶ 65    In this appeal, Charles Dixon, who elected to forego the reasonable assistance of postconviction counsel, takes the position that following his voluntary waiver of counsel during second stage proceedings, he was entitled to production of the entirety of the public defender's trial files as a matter of right because, as in the case of any other client who discharges a lawyer, the lawyer cannot resist production on the grounds of privilege or work product.[1] The majority chooses to bypass dispositive threshold issues of *res judicata* and the demonstrable lack of merit in Dixon's claims of ineffective assistance. Instead, my colleagues seize on the distinction between production of trial files to a former client (which they over-broadly label "work product") and "discovery" and conclude that nothing in the substantial body of law vesting discretion in the trial court to preclude a postconviction petitioner from engaging in a fishing expedition in an attempt to discover a basis for relief precludes the broad production of documents Dixon seeks. See *People v. Hickey*, 204 Ill. 2d 585, 598 (2001) ("[B]ecause postconviction proceedings afford a defendant only limited review, and because there is an opportunity for abuse of discovery, a circuit court must be cautious in the exercise of its authority to order discovery."); *People v. Enis*, 194 Ill. 2d 361, 415 (2000) (discovery properly

---

[1]Private counsel who charge for their services have a lien for payment, which they may assert in response to a request from the client to turn over their files. See *Twin Sewer & Water, Inc. v. Midwest Bank & Trust Co.*, 308 Ill. App. 3d 662, 667 (1999). Research has not disclosed any case holding that counsel who render services for free to indigent clients in criminal cases must, on demand, turn over their work product to a client who fires them.

denied when it amounted to a "fishing expedition"). I disagree and, therefore, respectfully dissent.

¶ 66    The majority accepts an exchange during oral argument between counsel for the State and Justice Pucinski as a concession by the State that Dixon was entitled to certain materials in his former lawyer's files and launches its analysis from that point. But this is plainly faulty reasoning. The questions asked of counsel for the State during oral argument pertained to materials such as witness statements taken by police, lineup verifications, and police reports provided to defense counsel by the State in discovery in the underlying murder prosecution. These materials did not become defense counsel's *work product* because they find their way into the trial file. Rather, "work product," as traditionally defined, consists of material prepared by or for a party in preparation for trial that discloses the "theories, mental impressions, or litigation plans of the party's attorney." Ill. S. Ct. R. 201(b)(2) (eff. July 1, 2014). By labeling the entire trial file "work product" and then declaring that because materials are in the file, Dixon is entitled to them, the majority has improperly expanded the scope of work product.

¶ 67    Apart from the majority's miscategorization of the materials sought by Dixon as work product, the State's position here cannot bind the office of the public defender, the office the majority declares is required to produce its files. Key to the majority's reasoning is its conclusion that the materials Dixon sought were not "discovery" because they were in his own attorney's files. Unexplained then is why the *State's* concession as to materials in *its* possession has any significance. *Vis-à-vis* the State, Dixon's requests clearly were discovery and the trial court properly exercised its discretion to determine which of those materials the State was required to produce. But the State is not and never has been in possession of defense counsel's work

product—the focus of the majority's analysis—and so could not concede that it should be produced.

¶ 68     The public defender's office represented to the trial court that compliance with Dixon's demand would impose an enormous burden on the office, and given that the majority's reasoning would apply to countless postconviction petitions, it is clear that it would.[2] Neither the Office of the State Appellate Defender (OSAD) nor the majority articulate any basis to limit the majority's holding to postconviction petitioners who elect to represent themselves. For if the entirety of an attorney's files must be produced to a former client as a matter of right because there is no "work product" privilege, then petitioners who claim (as they often do) that their appointed counsel is not communicating with them should be entitled to that material as well, so that they can ensure that their claims are adequately presented. The majority expresses displeasure at the length of time Dixon's petition has been pending, but the long-term effects of its ruling will exacerbate even further the delays in cases that will remain pending on the circuit court's docket while petitioners comb through their files in an effort to discover a basis for postconviction relief or second-guess their lawyer's decisions about what claims should be pursued. Indeed, this exercise is exactly what the majority contemplates: "The trial file may be the best place for Dixon to look to determine which of his counsel's strategic decision can be challenged in a postconviction petition." *Supra* ¶ 40. Under this reasoning, second stage proceedings do not serve to clarify and refine claims already raised in a postconviction petition. Instead, they are a launching point for petitioners to attempt to assert new claims.

---

[2]Although OSAD's position is that postconviction petitioners are entitled to these materials as a matter of right, it has not, as far as the record discloses, volunteered to produce to Dixon the entirety of *its* files on his direct appeal (and in this appeal), which would, under the majority's reasoning, be necessary for Dixon to adequately state his claim of ineffective assistance of appellate counsel.

¶ 69     And delay is not the only inevitable consequence of the majority's ruling. Wholesale production of trial files to postconviction petitioners is an expensive proposition and one undoubtedly not contemplated in the public defender's (or OSAD's) budget, either in the cost of paper, ink, and postage necessary to comply or in the human cost of countless hours devoted to reviewing such materials prior to production. And, like OSAD, the public defender's office has a first in, first out (FIFO) approach to handling postconviction petitions, *i.e.*, they are addressed in the order in which they were filed, oldest first. What priority then should the office afford to the task of reviewing and producing trial files for a client who elects to forego representation? Additionally, once produced, where will the materials (often voluminous) be kept: in the prisoner's cramped cell, in the law library of the penal institution, or should prisons provide storage rooms for such materials? Finally, because, according to the majority's reasoning, production will include trial counsel's work product to which the State is not privy (and is not entitled to review unless and until the client elects to disclose it), how can a court be confident that work product appended to a postconviction petition has not been altered or is in the same condition as it was when produced to the petitioner? The only way to guard against omissions, alterations, or outright forgeries would be to drag defense counsel back into the case, have him or her compare the exhibits to the petition to the originals, and certify to the court that the exhibits either are or are not true, complete, and correct copies of the materials produced. The ramifications of the result the majority reaches are, simply put, enormous and threaten to strain to the breaking point the already limited resources of public law offices and trial courts. The majority discounts these concerns, labeling them "little more than a thought exercise" (*supra* ¶ 50) and observing that the result reached here would *only* apply when a petitioner claims his trial counsel was ineffective. But experience shows that most postconviction petitioners fault

their trial lawyers' performance (as does OSAD), so the majority's attempt to limit the reach of its holding fails. When considered in the context of the limited scope of postconviction relief, these practical considerations are reason alone to avoid the result the majority reaches.

¶ 70    But, as noted, there are other issues the majority wholly fails to address that would render its analysis unnecessary. First, as the tortured history of Dixon's prosecution and postconviction proceedings discussed below demonstrates, Dixon's petition is barred by *res judicata* and, beyond that, his claims of ineffective assistance are meritless as they are flatly refuted by the record. Second, a detailed discussion of the procedural history of the underlying prosecution discloses Dixon's extensive involvement in his defense and the significance of that involvement to his claim that the circuit court "pulled the rug out" from under him by denying him access to the entirety of the public defender's files, rendering his waiver of counsel involuntary.

¶ 71    The majority truncates the facts of the underlying case, describing Dixon's conduct as follows: "Twenty years ago, Charles Dixon went into Iona Feldman's shoe repair shop and beat him with a stick. Dixon took Feldman's wallet and left. About three months later, Feldman died from his injuries." *Supra* ¶ 5. But the evidence against Dixon was overwhelming and bears summarizing, given its relevance to the viability of his ineffective assistance claims and because it has not heretofore been made the subject of a published opinion. See *People v. Dixon*, 366 Ill. App. 3d 848, 849 (2006) (no issue raised on direct appeal required discussion of trial evidence).

¶ 72    On August 10, 1998, Dixon and his former girlfriend, Darlene Mitchell, ran into each other in the Rogers Park neighborhood of Chicago. Later that day, Dixon told Mitchell there was a woman who owned a dry cleaners in the neighborhood who would lend him money so that they could buy drinks. On their way to the dry cleaners, Dixon passed a wood pile in Charles

Bassani's backyard and picked up a piece of wood two and a half feet long and four to five inches wide, "thicker than a tree branch." Bassani saw Dixon take the wood but thought better of confronting him.

¶ 73 When the pair arrived at the dry cleaners around 4 p.m., Dixon left the wood outside. When Dixon entered, the owner, Alla Ness, who knew Dixon from the neighborhood and had previously lent him a small sum of money, told Dixon she had no money. Dixon left and told Mitchell there was another business owner in the neighborhood who owed him money. When they reached Feldman's shoe repair shop, Dixon told Mitchell to wait in the alley and he entered the store holding the wood. After a few minutes, Dixon ran out of the shop with a "crazed, freaked out look" on his face and with blood all over his shirt. In one hand, Dixon held the wood; in the other, he had Feldman's wallet. Dixon told Mitchell that Feldman did not want to give him money and tried to stab him, so Dixon "took it." Dixon also told Mitchell that Feldman was calling the police, so they had to leave. Dixon tossed the piece of wood in the alley, took the cash from Feldman's wallet, which included a $100 bill, and discarded the wallet as well.

¶ 74 Feldman was lying on the floor of his shop, having sustained numerous blows to the head and was bleeding both externally and internally. Around 5 p.m., he was able to call his wife Jane, telling her he had been beaten and robbed by three men, one "so strong with a stick, a tall big stick." Feldman's wife called police and eventually reached Ness, who ran to the shop. Police had already arrived and found Feldman on the floor of the shop surrounded by dried blood and dried vomit. When Ness arrived, she saw Feldman in an ambulance covered in blood. Feldman was transported to the hospital with severe brain injuries and shortly thereafter lapsed into a permanent vegetative state. He died three months later.

¶ 75    After Dixon beat Feldman, he went with Mitchell to an apartment at 1331 West Touhy Avenue, where Mitchell's boyfriend, Donald Chastang, lived with Joey Lyles. Dixon removed his shirt, which Mitchell washed and hung to dry. Dixon gave Lyles $100 and asked him to buy drugs. Later, Mitchell and Dixon went to another friend's apartment, where Mitchell got Dixon a different shirt and put his old one in a laundry bag. They returned to Chastang's and Lyles's apartment and were drinking and using drugs. When Mitchell later refused to leave with him, Dixon started beating her and put a knife to her throat. Lyles went to another room to get a hammer to defend Mitchell, but Mitchell was able to wrest the knife from Dixon. Dixon started to leave, apologized, and at the front door of the apartment, asked Lyles to speak to Mitchell to see if his "secret" was "safe" with her. Lyles spoke to Mitchell and relayed what she had said to Dixon, and Dixon left.

¶ 76    Early the next morning, Dixon returned to the apartment, asking Lyles to again speak to Mitchell to ask if his "secret" was "safe." Lyles did as he was asked and conveyed what Mitchell said to Dixon, who expressed relief. Dixon then asked Lyles if he had heard anything about the "nine-one," which Lyles understood to refer to a murder.[3] Lyles denied that he had heard anything, to which Dixon responded, "good," because that meant there were no witnesses. Dixon then informed Lyles that he had cut his telephone wires so that no one could make a phone call. Lyles later saw a severed wire outside, but it was not his telephone line.

¶ 77    On August 12, 1998, Dixon again arrived at Lyles's apartment and asked Lyles and Chastang, who were outside, about Mitchell. Dixon was told she would not come out. Dixon asked them if Mitchell had told anyone about their "secret." Chastang swung a crutch at Dixon

---

[3]See 720 ILCS 5/9-1 (West 2016) (elements of first degree murder).

and told Dixon he would not let Dixon do to him what he had done to the "old man," to which Dixon responded, "now both of you all got to die."

¶ 78   On August 18, Chastang approached police officers at a gas station, inquiring what someone should do if they had information about a crime, but were afraid to report it. Chastang had an outstanding parole violation warrant and was ultimately arrested and taken to the police station, where he told police he had information regarding Feldman's murder. The detectives working on the case, Nick Rossi and Edward Louis, were contacted and later arrived to speak to Chastang. They accompanied him to his apartment, where they also spoke to Mitchell. Mitchell led them to the apartment where she had put Dixon's bloody shirt. Police retrieved the shirt, but by then it had been washed and folded. The detectives likewise interviewed Lyles, Ness, and Bassani, who picked Dixon out of a photo array as the man who took wood from his backyard, and began looking for Dixon, who by then had fled to Minnesota.[4]

¶ 79   After Feldman died on November 11, 1998, an arrest warrant—charging Dixon with various offenses, including first degree murder, armed robbery, and aggravated battery—was issued. Around the same time, Dixon called Mitchell's office, posing as a state's attorney. When Mitchell took the call, she recognized his voice. Dixon asked her if she was cooperating with the police, which she denied.

¶ 80   In early 1999, authorities in Minnesota, who had Dixon in custody, contacted Rossi and Louis. Dixon was extradited after a hearing, at which he and Mitchell testified. Dixon testified that he had been in Minnesota on the day of the murder.

---

[4]According to documents Dixon obtained in July 2003 pursuant to a Freedom of Information Act request he pursued himself, he told caseworkers from the Community Human Service Department of Ramsey County, Minnesota, that he had arrived in Minnesota on August 13, 1998.

¶ 81    Once back in Chicago, Dixon agreed to speak with the detectives. He appeared to understand their questions and gave clear answers. Dixon never complained that he had taken too much or been given too little medication. Dixon initially told the detectives that he had seen two boys on Jarvis Avenue the day of the murder and that one of them had a stick. He claimed to have seen them leaving Feldman's shop, and when Dixon entered, he saw Feldman lying on the floor bleeding and he ran away. After the detectives confronted him with information they had from other witnesses and informed him they had the shirt he had been wearing that day, Dixon admitted that he had struck Feldman over the head four or five times with a tree limb because he and Feldman had gotten into an argument. Dixon claimed Feldman nicked him with "some kind of cutting tool."

¶ 82    The detectives contacted Assistant State's Attorney Michael Swart, who arrived to interview Dixon. Dixon, who was "lucid, aware, and calm," told Swart the same story he relayed to the detectives about beating Feldman, but he declined to have his statement memorialized. Dixon explained his reluctance to memorialize his statement to Swart. If he admitted in a statement to murdering Feldman, he would get life; if he admitted to armed robbery, he would be guilty of felony murder, and he would get the death penalty. So his life was over, either way. After Rossi and Louis left the room, Swart asked Dixon how he had been treated by the detectives. Dixon responded that he had been treated "fine" and had no complaints. He did not complain to Swart of any physical discomfort.

¶ 83    In a later interview, Dixon told Swart that Rossi and Louis had done a good job investigating Feldman's murder and that if any of his family members was ever the victim of a crime, he hoped Rossi and Louis would be assigned to the case because "they would get the right

guy." Dixon announced that he had decided he would have a jury trial because all he needed to do was convince one person and that he had decided to "clean himself up, look like he cared about himself, *** let his lawyer do the rest" and "go down fighting."

¶ 84    After Dixon was indicted, Assistant Cook County Public Defender LaFarrell Moffett of the Homicide Task Force was appointed to represent him. The Cook County Public Defender's website describes the Homicide Task Force as follows:

> "The Homicide Task Force is a specialized division of the Law Office of the Cook County Public Defender, consisting of lawyers deemed to have sufficient experience to represent indigent people who are accused of first degree murder. Assistant Public Defenders assigned to the Homicide Task Force have the resources of experienced investigators and support staff, and are able to enlist the help of highly qualified lawyers from throughout the Office to assist them at trial. Each member of the Homicide Task Force represents his or her client from the beginning of the case at the indictment stage through any sentencing that may take place after trial." www.cookcountyil.gov/service/divisions-public-defenders-office (last visited May 3, 2019).

¶ 85    On June 15, 2001, the State indicated its intent to seek the death penalty based on felony murder, the age of the victim, and the exceptionally brutal or heinous nature of the crime. As was his practice in every capital case, Moffett subpoenaed and obtained all of Dixon's medical records.

¶ 86    Discovery, motion practice, and pretrial proceedings continued over the next four years. Among the numerous motions Moffett filed on Dixon's behalf were a motion for a medical

examination to determine Dixon's physical fitness to stand trial and motions *in limine* to (i) prohibit introduction of evidence regarding a currency exchange transaction, (ii) preclude the prosecution from objecting during trial to "spontaneous statement testimony" by Feldman during the phone call to his wife to the effect that "three black men" had attacked him, (iii) bar evidence of Dixon's "bad acts" in earlier incidents involving Mitchell, including a domestic battery on July 15, 1998, (iv) preclude the use of a prior conviction to impeach Dixon or, alternatively, to "sanitize" reference to Dixon's multiple convictions for robbery and armed robbery by omitting the names of those offenses, and (v) prevent the use of "mug" photos of Dixon. As noted, Moffett also obtained all of Dixon's medical records. In response to the State's discovery request, Moffett identified several doctors and medical personnel who treated Dixon and prescribed and filled prescriptions (identified by specific numbers) for Dixon prior to his extradition from Minnesota.

¶ 87    Moffett filed three separate motions to suppress Dixon's statements to police. The motions claimed police (i) failed to administer *Miranda* warnings and continued to interrogate Dixon after he invoked his rights, (ii) coerced Dixon's incriminating statements,[5] and (iii) conducted a lineup without Dixon's attorney despite his requests that Moffett be present. Moffett also sought to suppress certain witnesses' lineup identifications on the ground that the composition of the lineups was suggestive.

---

[5]Dixon's theory of coercion—based on contemporaneous, voluminous notes he kept during the course of his case and provided to Moffett—vacillated between the "misadministration" of medication theory under which he recalled nothing about the interrogation and a claim that he recalled the interrogation and that Rossi and Louis physically tortured him to coerce a confession.

¶ 88    An evidentiary hearing on Dixon's motion to suppress based on the failure to give *Miranda* warnings was held on July 23, 2002. Rossi and Louis testified to multiple occasions when they gave Dixon *Miranda* warnings, which he indicated he understood. They also testified to being present when Dixon was admonished by Swart and another assistant state's attorney. At the conclusion of the State's presentation, Moffett told the court that he was "not in position to call witnesses today," but that he was not resting on the motion. When the court reconvened after a lunch break, Moffett informed the court that Dixon rested and that he was prepared to argue the motion, which was later denied.

¶ 89    On August 20, 2002, following the denial of the first motion to suppress, Dixon filed a motion seeking appointment of an attorney other than an attorney from the public defender's office. Dixon told the court he had filed a complaint against Moffett with the Attorney Registration and Disciplinary Commission and that Moffett "had did [*sic*] nothing but lie and used deception in an attempt to convince defendant that he would put up the best possible defense while doing nothing to follow-up on his strategies." The motion went into great detail about Moffett's shortcomings, including his strategy in connection with the motion to suppress his statements as coerced (as to which no hearing had yet been held), which entailed postponing Dixon's testimony regarding the interrogation until trial. The motion to appoint new counsel was denied.

¶ 90    On February 18, 2003, Dixon, purporting to act *pro se*, also filed a motion to dismiss his indictment. The motion contended that the 1992 version of the Criminal Code of 1961, under which he was indicted, did not become effective until 1993. Therefore, the State's citation of the 1992 version in his indictment rendered it invalid. The motion was supported by Dixon's 15-

page affidavit in which he cited and discussed dozens of authorities and made multiple legal arguments. During a colloquy with the court regarding this motion, the court explained that Dixon was represented by Moffett, who was not electing to pursue the motion to dismiss. Dixon expressed concern that if he withdrew the motion, he might waive his arguments that the statute under which he was indicted was unconstitutional. After the court explained to him that constitutional arguments would not be waived, Dixon asked whether the court would order the State to answer his motion, he could then stand on it as written, and the court could "take judicial notice and give me some type of conclusion of law." The court then denied the motion, to which Dixon responded, "I will go for that."

¶ 91    In advance of the hearing on the motion to suppress, asserting Dixon's claim that the detectives coerced his incriminating statements by "misadminstering" pain medication during his interrogation, Moffett corresponded with Dr. Jeffrey Teich. Specifically, on March 19, 2001, Moffett wrote to Dr. Teich referring to Dixon's hip replacement surgery, stating:

> "At the time Mr. Dixon was questioned regarding this case he was taking gabapentin and naprosyn. I would like to know what effects these drugs would have had on Mr. Dixon during a period of extended police interrogation, especially if the dosages were misadministered during the period of interrogation."

On April 23, 2001, Moffett corresponded again with Dr. Teich and provided him with Dixon's medical records from Illinois and Minnesota. Moffett stated: "Once again I am concerned, primarily, with: the effect of his medicines, or the misadministration of his medicines, on him

during extensive and prolonged interrogation; and his current ability to stand trial while on his current treatment regimen." Dr. Teich met with Dixon on June 4, 2001. According to Dixon,

> "about five (5) minutes into the interview Dr. Teich asked defendant 'if he would take a plea bargain?' Defendant said 'No.' Dr. Teich then became belligerent, insisting that defendant 'not only consider a plea agreement, but that he should take any offer made by the States Attorney.' " [6]

The interview then ended. Finally, on June 13, 2001, Moffett wrote to Dr. Teich, requesting return of the case materials he had forwarded and stating, "I will not need an oral or written report from you. Do prepare your bill and forward it to me."

¶ 92     As noted, in advance of the hearing on the motion to suppress his statements as coerced, Moffett informed Dixon that he did not intend to call him as a witness. According to Dixon, who took and kept copious notes and prepared and had notarized his own "affidavits" throughout his case,[7] Moffett told him "we should not try to solicit sympathy from the court." The judge "would not consider my medical injuries as evidence in that manner," and "we should save that evidence for the jury." Moffett further explained to Dixon that although a judge would be unlikely to grant a motion to suppress, "that don't [*sic*] mean a jury will find you guilty because you have a statement against you."

¶ 93     At the evidentiary hearing held on February 11, 2003, both Rossi and Louis testified. They flew to Minnesota to return Dixon to Illinois. Dixon was not held in a medical unit in

---

[6]Dixon also claimed that another doctor who interviewed him for a psychiatric evaluation on September 10, 2001—an interview arranged by Moffett—likewise "badgered" him to accept a plea bargain.

[7]All of these materials were retained by Dixon and in his possession throughout these proceedings, as is evident from the attachments to his postconviction petition.

Minnesota, but told them he had undergone hip surgery and he appeared to be walking slowly. They were unaware of any medications Dixon was taking, and Dixon did not have personal effects with him. Dixon was interviewed three times on May 18, 1999: the first interview started around 7 pm and lasted for 90 minutes; after a 30-minute break, the second interview began at 9 pm and lasted for 30 minutes; and the third interview was about 10 minutes later and lasted for 10 minutes. Rossi and Louis were always together in the interview room with Dixon and neither spent any time alone with him. Dixon was not handcuffed, and the detectives never physically touched him during the interviews. Dixon never complained of pain that evening. Rossi noticed Dixon fidgeting while sitting on a steel bench during the third interview and asked him if he was uncomfortable. Louis then retrieved an upholstered office chair for Dixon from another room. Neither Rossi nor Louis administered any medication to Dixon that evening, and neither observed the other do so. The only things they gave Dixon were food, coffee, water, and cigarettes. Swart also testified that he interviewed Dixon in the early hours of May 19 and did not threaten him, as Dixon later claimed, with leaking information to the *Chicago Tribune* and stalking his mother if he refused to cooperate. Moffett, as planned, did not call Dixon as a witness. The motion to suppress was denied.

¶ 94     Moffett also filed a motion to suppress Bassani's and Ness's identification of Dixon on the ground that his attorney was not present during the lineups. A third evidentiary hearing on this motion was held on April 28, 2003, during which Moffett called Dixon to testify. Dixon testified that he told everyone he came in contact with that day that he wanted his lawyer present for the lineups. The State established that Dixon had been in court earlier that day and both he and his lawyer had been informed that the lineups would take place that evening at 7:30 p.m. The

court denied the motion. In his August 20, 2002 motion for appointment of new counsel, Dixon revealed to the court communications he had with Moffett (again, in advance of any hearing on the motion to suppress) in which, according to Dixon, Moffett informed him that he was aware that the lineup would be conducted and deliberately decided not to appear because his absence could give Dixon an issue on appeal. See *United States v. Wade*, 388 U.S. 218, 236-37 (1967) (accused entitled to presence of counsel at lineup).

¶ 95    The State withdrew its request for the death penalty, and Dixon's trial commenced in June 2003. The State elected to proceed on the murder and armed robbery counts. In addition to other witnesses, Mitchell, Chastang, Lyles, Ness, Bassani, Rossi, and Swart all testified consistent with the evidence summarized above. In particular, Mitchell, Chastang, and Lyles did not recant their pretrial statements implicating Dixon in the murder.

¶ 96    Mid-trial, Moffett informed the court that he believed Dixon had taken too much of his medication and sought a mistrial on the grounds of unfitness. A psychiatrist evaluated Dixon over a break in the proceedings and declared him fit to proceed with trial.

¶ 97    Dixon elected to testify and focused on his claim that Rossi and Lewis "misdaministered" his pain medication, so that he was "very, very dizzy, very, very drowsy." It was like he "was drunk" during the interrogation, and he did not know what he was saying. Dixon claimed to have no memory of anything he said during the interrogation, and denied that he had anything to do with Feldman's murder. Dixon told the jury that he was a "wildlife artist" and that he likes to draw "from life," so he may have picked up a piece of wood from Bassani's backyard, although he had no recollection of doing so on August 10. Contrary to his testimony at the extradition hearing, Dixon testified that he could not recall where he was on August 10, 1998, and was

impeached with the extradition hearing transcript. Dixon told the jury if Ness said he came into her business that day and asked for money, "that's what I did." He speculated that Mitchell was motivated to implicate him in the murder because she was upset that he left for Minnesota.

¶ 98     Moffett called Rossi as a defense witness and established that when he and Louis picked Dixon up in Minnesota, Dixon had with him a plastic bag containing personal property, including several medications prescribed for him in Minnesota. Moffett also impeached Rossi with his testimony at the suppression hearing, during which he said Dixon had no personal effects with him when he and Louis picked him up in Minnesota.

¶ 99     Dixon's jury was instructed that they were to determine whether Dixon made the statements attributed to him, and if so, what weight should be given to those statements considering the circumstances under which they were made. Dixon did not testify that Feldman cut him during the incident or that he acted in self-defense in beating Feldman, and he did not ask for a self-defense jury instruction.

¶ 100   On June 27, 2003, the jury returned its verdict finding Dixon guilty of first degree murder and armed robbery.

¶ 101   On July 29, 2003, Moffett filed a motion for a new trial on Dixon's behalf, setting forth 18 specific issues warranting relief, citing dates and pages of the transcript for the claimed errors. Among the issues raised was the ruling on Dixon's motion to suppress his incriminating statements as coerced.

¶ 102   On August 22, 2003, Dixon filed his own detailed motion for a new trial, including his claim that he had been denied the effective assistance of counsel because Moffett "deliberately and maliciously failed to introduce evidence and subpoena witnesses at the hearing on the

motion to suppress" his statements as coerced. Dixon claimed that the evidence would have shown that Rossi, Lewis, and Swart "perjured themselves" at the hearing and that Moffett refused to introduce evidence at the hearing for "the sole purpose of letting the prosecution introduce to the jury an involuntary confession as substantive evidence." Dixon also claimed his lawyers were ineffective because they induced him to "change his trial testimony to support their assertions during opening statement, then failed to present the documents into evidence, or subpoena witnesses that would support their assertion." As the only misstatement ever identified by Dixon in his lawyer's opening statement concerns the mention of a reward, this claim undoubtedly concerns that claimed error.

¶ 103   On the same date, Dixon filed a 33-page document, styled "Petition for Postconviction Relief with Memorandum of Law," and accompanied by voluminous exhibits.[8] In his petition, Dixon cited case law for the proposition that his petition was not premature, even though he had not yet been sentenced. Among the hundreds of pages of exhibits were (i) Dixon's advice to Moffett about the best presentation of his case, including "poster-size blowups" of medical exhibits, (ii) questions Dixon sent to Moffett about trial strategy, including how Moffett planned to "lay a foundation" for "reward information that was retrieved from [Alderman] Joe Moore's office," (iii) correspondence to Moffett referring to the "selective amnesia" of medical personnel, and (iv) Dixon's ARDC complaint against Moffett claiming that Moffett used his "psychic abilities to determine without investigation" that all the doctors Dixon had seen will "make up new medical records" and "will convince the courts that defendant's medical pathology is a lie."

---

[8]The exhibits appended to the motion comprise almost an entire volume of the common law record and include substantial excerpts from the trial transcript and extensive medical records.

¶ 104  Because Dixon had not yet been sentenced, the trial court treated this latter filing as a supplement to his *pro se* motion for a new trial. Dixon ultimately adopted issues 8 through 18 in the motion for new trial filed by Moffett together with those raised in his own motion.

¶ 105  Given Dixon's claims of ineffective assistance, the court conducted a *Krankel* hearing, during which Dixon expounded at length regarding his complaints about Moffett's performance. Although the court asked Moffett if he wanted to respond to Dixon's claims, Moffett pointed out that he was still Dixon's lawyer and so could not. The court found that (i) Moffett had not rendered ineffective assistance, (ii) the evidence against Dixon was "overwhelming," and (iii) Dixon was not entitled to the appointment of new counsel to pursue his ineffective assistance claims. After an extensive colloquy regarding Dixon's desire to represent himself, the court allowed Moffett to withdraw.

¶ 106  During the same hearing, Dixon asked whether he could get materials from Moffett now that he had discharged him as his lawyer. He professed the need for the materials because he was sure he would need to amend his postconviction petition later. The trial judge responded:

> "If postconviction gets to a point where a hearing will be held, then there
> will be discovery, and you will be able to get that, or your attorney will be able to
> get that, but there is no discovery prior on a postconviction matter by case law."

Dixon requested time to prepare for the hearing on his posttrial motion, which the court granted, and the court indicated its intent to have Moffett present to testify regarding Dixon's allegations of ineffective assistance now that he no longer represented him. The State agreed to provide Dixon the transcript of the hearing on the motion to suppress his statements as coerced and Rossi's and Louis's trial testimony.

¶ 107   At the hearing on Dixon's posttrial motion, the trial court inquired of Dixon whether he wanted to present any evidence. Dixon declined. The State called Moffett as a witness. Moffett categorically denied advising Dixon to lie at trial so that his testimony would match Moffett's theory of defense. Moffett tried to convince Dixon before trial to cut his hair, but he refused, leading Moffett to comment that if he was unable to persuade Dixon to follow that basic advice, it was "nonsense" to believe that he could have convinced him to lie at trial. Moffett learned from Dixon that he had been on medication during his interrogation and it was only based on what his client told him that Moffett was able to track down the vials of medication he used at trial to impeach Rossi. Although Dixon faulted Moffett for failing to present alibi testimony regarding his whereabouts on August 10, 1998, Moffett interviewed every family member identified by Dixon, and none said he was with them that day. And when Moffett learned of Dixon's testimony at the extradition hearing to the effect that he was in Minnesota the day of the murder, he pointed out to Dixon that his alibi theories could not both be true. Moffett investigated every potential alibi provided to him, but none was viable, and he so advised Dixon. Although Moffett obtained all of Dixon's medical records and considered presenting medical testimony, he ultimately determined that Dixon's medical history was not "strategically significant" and would not add to his defense.

¶ 108   The trial court afforded Dixon the opportunity to cross-examine Moffett. Dixon asked his former lawyer about (i) what he did to investigate an alibi defense, (ii) his earlier plans and discussions with Dixon about calling medical personnel as witnesses at trial, and (iii) his claimed failure to impeach Rossi at trial with the medication (although, as noted above, he did). The court did not curtail the examination, but Dixon informed the court, "at this time, I don't think it would

be appropriate to even go any further with Mr. Moffett." Dixon requested a continuance so that he could have his family come in to testify that they had never spoken to Moffett. The court denied Dixon's request. The court asked if Dixon had any further questions for Moffett, and Dixon said, "No, I have no further questions." Dixon never asked Moffett why he decided not to call him as a witness at the suppression hearing or why he did not present evidence at trial of a reward being offered for information about Feldman's murder.

¶ 109    Representing himself at sentencing, Dixon called his brother as a mitigation witness and in allocution told the court that every witness at his trial, with the exception of Ness, perjured themselves. Contrary to his trial testimony that he could not recall where he was on the day of the murder, Dixon did admit he was with Mitchell the afternoon of August 10, but claimed he bought her a beer and did not see her again until the evening. The court sentenced Dixon to life imprisonment for Feldman's murder, with a consecutive sentence of 30 years on the armed robbery conviction.

¶ 110    At the conclusion of the sentencing hearing, Dixon expressed his desire to file his postconviction petition immediately. The court advised him that it had appointed the State Appellate Defender to represent him on appeal and that he should consult with counsel before filing his petition. Dixon then stated, "I need a motion for the record and then a motion for the discovery because all of them have relevant information to support my arguments" in the postconviction petition. He asked to stay his sentence so that he could remain at the Cook County jail and work on his petition. The court denied the stay and advised Dixon that OSAD would receive "any discovery and they will also receive a transcript of the proceedings" so

Dixon could obtain that information from his lawyer. The trial court also advised Dixon "there is no discovery as to a post conviction."

¶ 111   In his direct appeal, Dixon failed to pursue any of the specific issues relating to Moffett's trial performance identified in his posttrial motion. Rather, Dixon claimed that (i) the trial court deprived him of his right to counsel when it granted Moffett's motion to withdraw, but refused to appoint new counsel, (ii) because the record established that Moffett was ineffective, the trial court should have appointed counsel to pursue his posttrial ineffective assistance claim, (iii) he was denied due process when the trial court allowed the State to present evidence on the motion for a new trial, but denied him the opportunity to present responsive evidence, (iv) his life sentence was void, (v) his sentence for armed robbery could not be consecutive to his life sentence, and (vi) the trial court failed to properly admonish him regarding the need to file a motion to reconsider his sentence. *Dixon*, 366 Ill. App. 3d at 850-51.

¶ 112   During the pendency of his direct appeal, Dixon moved to file a supplemental *pro se* opening brief. When that motion was denied, he filed a motion to dismiss OSAD as his counsel and to proceed with his appeal *pro se*, which was likewise denied.[9]

¶ 113   In our decision on Dixon's direct appeal, with respect to the trial court's finding that Dixon was not entitled to new counsel posttrial, we stated:

> "We find that *the trial court's determination that trial counsel provided*
>
> *effective assistance to defendant during the pendency of his case was not*
>
> *manifestly erroneous*, and the record does not reveal that the appointment of

---

[9]These filings are reflected on the court's electronic docket for the case, but the actual motions have been destroyed as, prior to the advent of electronic filing, it was the court's policy to destroy records after seven years.

counsel was necessary for investigation into defendant's claims. *The trial court conducted numerous inquiries and allowed defendant ample time to develop his allegations against his trial counsel over several court dates. \*\*\* Furthermore, the record does not \*\*\* reflect \*\*\* any possible neglect of his case by trial counsel*." (Emphases added.) *Id.* at 854.

We rejected Dixon's other claims of posttrial error, but did find that the armed robbery sentence could not be consecutive to Dixon's life sentence and so modified that sentence to run concurrently. *Id.* at 856-57.

¶ 114   On September 16, 2005, while his direct appeal was still pending, Dixon filed his 31-page postconviction petition, accompanied by close to 400 pages of exhibits. The body of the petition is a carbon copy of the petition Dixon filed on August 22, 2003, and repeats *verbatim* his ineffective assistance claims against Moffett, including the claim that Moffett "deliberately and maliciously failed to introduce evidence and subpoena witnesses" on the motion to suppress Dixon's statements as coerced. As he did in 2003, Dixon claimed that counsel's conduct was for "the sole purpose of letting the prosecution introduce to the jury an involuntary confession as substantial [*sic*] evidence in violation of the sixth and fourteenth amendment to the United States Constitution." Remarkably, Dixon's 2005 petition continued to claim that his recitation of the testimony at the suppression hearing was from memory, despite the fact that, as noted above, the State provided him a transcript of that hearing at his request in 2003. And notwithstanding his opportunity to examine Moffett on this precise issue, Dixon claimed (as he had in 2003), "there is no reasonable trial tactic or strategy that would cause counsel to forego the introduction of the medication evidence and the witnesses in support thereof at the hearing to suppress."

¶ 115   In the same vein, the 2005 petition raises the identical claim regarding the promise of "reward evidence" in counsel's opening statement that was not forthcoming during Dixon's trial. Again, despite the opportunity afforded Dixon in 2003 to question his attorney regarding the failure to produce any reward evidence, Dixon claims, as he did in 2003, that the failure was "intentional" and part of Moffett's efforts to "sabotage" his case.

¶ 116   Because Dixon's direct appeal had not yet been resolved and a reversal of the trial court's determination that trial counsel was not ineffective would have mooted his postconviction petition and required remand for further posttrial proceedings, the petition was docketed and automatically passed to second stage. 725 ILCS 5/122-2.1(b) (West 2004).

¶ 117   Ultimately, after Dixon discharged the public defender in 2010, and after four years of motion practice, he filed a 35-issue, 281-page, handwritten amended petition on February 27, 2014. In a stunning example of revisionist history, Dixon offered an entirely new factual scenario to the one he conveyed to Moffett and testified to at trial. In Dixon's revised version of events, he recalled clearly what he did on the day of Feldman's murder. He met Mitchell (with whom he never had an intimate relationship), picked up a tree branch from Bassani's backyard to use in drawing a "Snowy Owl," tried to borrow money from Ness, bought Mitchell a beer, then went to his sister's house and babysat until 6 p.m. Although couched in different language, Dixon continued to claim Moffett was ineffective because, due to a "conflict of interest" (created by Dixon's conduct in filing an ARDC complaint against him), he "deliberately and maliciously" failed to present any defense. With respect to the suppression hearing, Dixon claimed he had told Moffett about the medications he had with him when he returned from Minnesota, but Moffett failed to confront the detectives with this information. He also repeated his claim faulting

Moffett for failing to call him as a witness at that hearing. As he had in his original petition, Dixon argued that Moffett "abandoned" him and "affirmatively aided the prosecutor" by allowing the introduction at trial of a coerced confession. Regarding Moffett's ineffectiveness at the suppression hearing, Dixon represented, "the allegations in this issue are based on matters of record[ ], no extrinsic evidence may be required." Dixon also repeated his claim regarding the reference to a reward in opening statement. Dixon newly sought to dismiss his indictment and raised new claims of trial error and prosecutorial misconduct. For example, instead of just claiming, as he had at sentencing and in his earlier petition, that every witness at the suppression hearing and his trial (with the exception of Ness) lied, he now asserted that the prosecution's presentation of this evidence constituted the knowing presentation of perjured testimony. He also accused the prosecution of discovery violations and the improper admission of other crimes evidence and accused appellate counsel of ineffective assistance for failing to raise issues on appeal.

¶ 118   The only claims in Dixon's amended petition that he pursues in this appeal are (i) that Moffett was ineffective because he (1) failed to call him as a witness at the coercion suppression hearing and (2) mentioned a reward in his opening statement, but did not later introduce evidence supporting that statement, and (ii) appellate counsel was ineffective for failing to raise and argue the foregoing issues. Against this backdrop, the conclusion is unavoidable that these claims are procedurally barred and substantively without merit.

¶ 119   First, and most obviously, Dixon's claims of ineffective assistance are barred by *res judicata*. All we need to do to make this determination is to review our decision on Dixon's direct appeal in which he raised and we rejected his claim that his trial counsel's performance

was deficient: "The record *** does not reflect *** any possible neglect of [Dixon's] case by his trial counsel." *Dixon*, 366 Ill. App. 3d at 854. Dixon chose to place the performance of his trial counsel before us in his direct appeal. Although his appellate counsel refrained from pursuing claims of ineffective assistance regarding individual issues raised by Dixon posttrial (for which Dixon now claims appellate counsel from OSAD was ineffective), she did claim the trial court erred in refusing to appoint new counsel because its determination that Moffett rendered effective assistance was manifestly erroneous. This required us to examine the record to determine if it disclosed possible bases for questioning Moffett's performance, and we concluded it did not. Importantly, that record included Dixon's own notes, correspondence with his counsel over trial strategy, and other documents he provided to the trial court (i) when he sought appointment of counsel other than the public defender and (ii) in his posttrial motion. Thus, Dixon actually litigated his counsel's effectiveness in his direct appeal, and he is foreclosed from relitigating that issue here. *People v. Williams*, 209 Ill. 2d 227, 232-33 (2004) (as a general rule, the doctrine of *res judicata* bars review of issues raised and decided on direct appeal, and issues that could have been raised on direct appeal, but were not, are forfeited); *People v. Davis*, 2014 IL 115595, ¶ 13; *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010) (proceeding under the Act is a collateral proceeding that is limited to claims that were not, and could not have been, previously litigated); *People v. Harris*, 224 Ill. 2d 115, 124-25 (2007); *Hickey*, 204 Ill. 2d at 595 ("The scope of postconviction relief is limited, through considerations of waiver and *res judicata*, 'to constitutional matters which have not been, and could not have been, previously adjudicated.' " (quoting *People v. Winsett*, 153 Ill. 2d 335, 346 (1992)).

¶ 120   It is clear that Dixon could have raised the very issues on direct appeal he now seeks to litigate via his amended postconviction petition. His failure to do so mandates that we affirm dismissal.

¶ 121   Defendants often raise claims of ineffective assistance on direct appeal. See *People v. Logan*, 352 Ill. App. 3d 73, 82 (2004) (on direct appeal, resolving defendant's claim of ineffective assistance based on failure to call alibi witnesses); *People v. Talbert*, 2018 IL App (1st) 160157, ¶¶ 47-54 (on direct appeal, rejecting defendant's argument that counsel was ineffective for failing to introduce testimony promised in opening statement); *People v. Grant*, 339 Ill. App. 3d 792, 799-800 (2003) (rejecting on direct appeal defendant's ineffective assistance claim based on counsel's failure to call codefendant to testify). Indeed, failure to pursue ineffective assistance claims on appeal can result in forfeiture. *People v. Erickson*, 161 Ill. 2d 82, 87-88 (1994); *People v. Keener*, 275 Ill. App. 3d 1, 6-7 (1995).

¶ 122   While sometimes the record is insufficient to determine whether counsel's performance was deficient, and so consideration of the claim must await the filing of a postconviction petition, Dixon's case was uniquely suited for the resolution of his ineffective assistance claims on direct appeal. *People v. Veach*, 2017 IL 120649, ¶¶ 46-49 (encouraging courts of review to resolve claims of ineffective assistance on direct appeal if record is sufficient). Unlike most defendants, Dixon had the opportunity to cross-examine his lawyer about his pretrial and trial decisions. Dixon took advantage of that opportunity to some extent but chose voluntarily to curtail his examination. Dixon cannot claim his own failure to ascertain from Moffett the reasons why he (i) chose not to call Dixon and present other evidence at the motion to suppress and (ii) mentioned a reward in opening statement but did not adduce any evidence on the topic, as a basis

for re-asserting these same claims in a postconviction petition. Accordingly, as a matter of law, Dixon's ineffective assistance claims are barred.

¶ 123 Even if *res judicata* did not bar Dixon's ineffective assistance claims, dismissal of the petition as frivolous and patently without merit would have been warranted because the record refutes Dixon's claims that the decisions he challenges were not the product of his attorney's trial strategy.

¶ 124 In this context, it is significant that Dixon's petition passed to second stage by default. Because his direct appeal was still pending when he filed that petition and resolution of the appeal in Dixon's favor would have entailed the appointment of new counsel and further posttrial proceedings, it was impossible for the trial court to meet the 90-day deadline for first-stage dismissal. 725 ILCS 5/122-2.1(b) (West 2004). Consequently, the trial court never had occasion to determine whether the petition was frivolous and patently without merit (725 ILCS 5/122-2.1(a)(2) (West 2004)), but we can consider that issue here. See *People v. Greer*, 212 Ill. 2d 192, 210 (2004) (in finding that counsel was properly permitted to withdraw, court addressed merits of defendant's postconviction petition that automatically passed to second-stage review). A petition that asserts an indisputably meritless legal theory may be dismissed by the trial court at the first stage. *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). An indisputably meritless legal theory is one "completely contradicted by the record." *Id.* at 16-17. Because we can affirm the dismissal of Dixon's amended postconviction petition on any ground appearing in the record (*People v. Brown*, 2018 IL App (4th) 160288, ¶ 45; *People v. Rivera*, 2014 IL App (2d) 120884, ¶ 8), I turn to the merits of Dixon's claims.

¶ 125 To prevail on an ineffective assistance claim, a defendant must prove (1) his lawyer's

representation fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for the defense lawyer's errors, the outcome of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 692 (1984). A "reasonable probability" is "defined as a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair." *People v. Patterson*, 2014 IL 115102, ¶ 81 (citing *People v. Evans*, 209 Ill. 2d 194, 220 (2004)). See *People v. Vera*, 277 Ill. App. 3d 130, 138 (1995). A defendant's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim. *People v. Morgan*, 187 Ill. 2d 500, 529-30 (1999). "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *Patterson*, 2014 IL 115102, ¶ 81.

¶ 126   Judicial scrutiny of counsel's performance "must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. *People v. Jordan*, 247 Ill. App. 3d 75, 82 (1993) ("A reviewing court must keep ever present the recognition that it is to give great deference to the performance of counsel and resist the temptation to second-guess a particular decision or omission.").

¶ 127   Only the most egregious of tactical or strategic mistakes can serve as the basis for finding a violation of a defendant's right to effective trial counsel, such as when counsel's chosen trial strategy results in the failure to conduct any meaningful adversarial testing of the prosecution's case. *People v. Reid*, 179 Ill. 2d 297, 310 (1997). Claims of ineffective assistance premised on strategic decisions made by trial counsel must be fairly assessed, making every effort "to

eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689; see also *People v. Fuller*, 205 Ill. 2d 308, 331 (2002) (issues of trial strategy must be viewed, not in hindsight, but from the time of counsel's conduct and with great deference afforded counsel's decisions).

> "[N]either mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently indicates the trial lawyer was incompetent. (*People v. Edwards*[, 218 Ill. App. 3d 184, 198 (1991)]). The defendant must overcome a 'strong presumption that counsel's complained-of action or inaction was merely trial strategy.' (*People v. Medrano*[, 271 Ill. App. 3d 97, 100 (1995)])." *People v. Vera*, 277 Ill. App. 3d 130, 138 (1995).

¶ 128 Where a defendant raises a *pro se* ineffective assistance claim in a postconviction petition, the trial court can rely on its own knowledge of counsel's performance at trial. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). If the court finds defendant's allegation to be without merit, it can deny the petition without further inquiry. *Id.*; see also *People v. Ward*, 371 Ill. App. 3d 382, 433 (2007). While questions regarding whether trial counsel's challenged actions were the product of trial strategy are generally reserved for second-stage review (*People v. Tate*, 2012 IL 112214, ¶¶ 18-19, 21-22), when the trial court can readily determine the issue at first-stage review, dismissal is appropriate. See *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009) (petition is frivolous or patently without merit if it has no arguable basis in law or in fact). Even under the low threshold applicable to first-stage review, the trial court could properly have dismissed Dixon's petition as frivolous and patently without merit.

¶ 129 Regarding Moffett's decision not to call Dixon as a witness at the hearing to suppress his statements as coerced, the record amply demonstrates that the decision was strategic for a

number of reasons.

¶ 130  First, it is obvious that Moffett knew, before the suppression hearing, about Dixon's medications and the fact that he had them with him when he returned from Minnesota. Nearly two years before the suppression hearing, Moffett corresponded with a potential expert about Dixon's medications and their possible side effects, and he identified specific prescription numbers in discovery.

¶ 131  Second, even before the hearing, Dixon's own notes (which he disclosed both to the trial court and the State in advance of the hearing) reveal that Moffett told Dixon he would not call him as a witness at the suppression hearing because Moffett believed he had a better chance of demonstrating that Dixon's statement was involuntary if he saved Dixon's testimony for trial. Experienced criminal defense lawyers often avoid previewing their client's testimony for the prosecution if they can avoid it, particularly if that testimony can be used to impeach the client if he elects to testify. Had Dixon testified regarding the "misadministration" of his medication at the suppression hearing, the State undoubtedly would have investigated what medications Dixon had been prescribed, and what their possible side effects were, and likely would have retained an expert to refute the ridiculous suggestion that Dixon could repeat consistent, coherent, and detailed statements regarding Feldman's murder to Rossi and Louis and later to Swart without having any recollection of doing so. Further, Moffett's use of the vials of medication he used at trial to impeach Rossi would have alerted the State to the issue and prompted further investigation, thus eliminating the element of surprise.

¶ 132  Finally, that Moffett's decision not to use Dixon's testimony at the coercion suppression hearing was strategic is underscored by the fact that, as reflected in the record, Moffett

considered calling Dixon at the first suppression hearing (but after the lunch recess, elected not to) and did call Dixon as a witness three months later at the hearing on the motion to suppress lineup identifications (where Dixon's testimony that he wanted his lawyer present could not come back to haunt him at trial). Thus, the conclusion is unavoidable that Moffett did not just forget to call Dixon as a witness at the suppression hearing regarding alleged coercion, he deliberately chose not to.

¶ 133 Accordingly, Dixon's claim that Moffett's decision not to call him and use other evidence at the suppression hearing constitutes ineffective assistance is patently without merit and squarely rebutted by the record.

¶ 134 As to Dixon's second claim, regarding the mention of a reward, the record also reveals that very early on in his representation of Dixon, Moffett subpoenaed information from Joe Moore, the alderman in Chicago's 49th Ward, which encompasses the Rogers Park neighborhood. Because it cannot arguably relate to anything else, we can assume that Moffett was seeking information regarding a reward posted for information pertaining to Feldman's murder. Again, Dixon's own notes reveal that he was aware of the information Moffett obtained because he asked Moffett how he intended to "lay a foundation" for the evidence at trial. And given Moffett's vigorous pursuit of Dixon's defense, there is no basis to conclude that defense counsel just decided to mention the reward in opening statement without having anything to back it up. We cannot know why that evidence was not introduced because Dixon did not ask Moffett about it at the hearing on his posttrial motion. But it is certain that its mention in Moffett's opening statement made absolutely no difference in the outcome of Dixon's trial, given the mountain of evidence supporting the jury's finding of guilt. Because prejudice is an

indispensable element of an ineffective assistance claim, Dixon's claim on this issue can be readily rejected because the record irrefutably shows a lack of prejudice. *People v. Hale*, 2013 IL 113140, ¶ 17; *Morgan*, 187 Ill. 2d at 529-30 (when defendant unable to show prejudice, claim of ineffective assistance may be rejected without examining whether counsel's performance was deficient); see also *Patterson*, 2014 IL 115102, ¶ 81 (speculation may not form basis of a claim of prejudice).

¶ 135 As to Dixon's third and final claim that appellate counsel on direct appeal was ineffective for failing to raise the foregoing issues, Dixon's motions filed in this court in his direct appeal to dismiss OSAD and proceed *pro se* make clear that appellate counsel's decisions regarding which issues to pursue on appeal were the product of strategy. And as revealed by correspondence between Dixon and appellate counsel appended to Dixon's postconviction petition, Dixon disagreed with counsel's decision not to pursue on appeal all of the issues Dixon wanted her to address, including the claims that Moffett was ineffective for failing to Dixon at the suppression hearing and for mentioning a reward in opening statement. So it is apparent that counsel made strategic decisions regarding the issues she did decide to pursue. *People v. Richardson*, 189 Ill. 2d 401, 413 (2000) ("Experienced advocates have always emphasized the importance of screening out weaker arguments on appeal and focusing on at most a few key issues."). Accordingly, Dixon's claim of ineffective assistance of appellate counsel is rebutted by the record and fails as well.

¶ 136 All of these bases support dismissal of Dixon's petition, as does the trial court's exhaustive analysis of *res judicata* in its written decision. The majority's decision to remand this matter for further proceedings preordains another fruitless waste of resources.

¶ 137  Because I disagree with the majority's conclusion that reversal is required based on the trial court's refusal to direct the office of the public defender to produce the entirety of its files to Dixon, I address Dixon's primary claim on appeal, *i.e.*, that his waiver of the reasonable assistance of postconviction counsel was not knowing and voluntary.

¶ 138  As is evident from the recitation of the proceedings in this case, Dixon has a long history of dissatisfaction with appointed counsel. As detailed above, during pretrial proceedings in his murder case, he filed an extensive motion to have counsel other than the public defender appointed. The record is replete with correspondence between Dixon and his trial lawyer, discussing the minutiae of counsel's approach to Dixon's defense. After his murder conviction, Dixon convinced the trial court to allow him to waive his constitutional right to counsel in posttrial proceedings, including a motion for a new trial, which he prepared *pro se*; in a *Krankel* hearing; in a hearing on his posttrial motion (during which he was afforded the opportunity to cross-examine his former lawyer regarding trial strategy); and at sentencing. During those proceedings, all of which Dixon handled *pro se*, the record makes clear that Dixon had access to an enormous amount of information from his trial files. He also unsuccessfully sought to discharge the Office of the State Appellate Defender as his lawyers on his direct appeal. He waived the reasonable assistance of the public defender in the trial court, where he filed an original and amended postconviction petition supported by hundreds of pages of exhibits. And, true to form, he attempted to file in this appeal a *pro se* supplemental brief addressing issues that OSAD strategically decided not to raise.

¶ 139  It is clear that Dixon is an extraordinarily experienced *pro se* litigant, who knowingly and voluntarily chose to forego the reasonable assistance of postconviction counsel. Dixon (i)

believes that every lawyer who has ever been appointed to represent him is "sabotaging" his case, (ii) has pursued substantive motions with citations to and discussion of authority, (iii) asked the judge at his criminal trial to "take judicial notice" and enter a "conclusion of law" so that he could preserve for appeal a constitutional issue he had raised, and (iv) handled on his own a *Krankel* hearing and the hearing on his posttrial motion and presented evidence and argued at his sentencing. See *People v. Lesley*, 2018 IL 122100, ¶ 51 ("The determination of whether there has been an intelligent waiver of the right to counsel must depend upon the particular facts and circumstances of each case, including the background, experience, and conduct of the accused." (citing *People v. Kidd*, 178 Ill. 2d 92, 104-05 (1997))). As he had countless times before, Dixon made clear to the trial court here that he did not want to be represented by the public defender under any circumstances.

¶ 140 With respect to his waiver of the reasonable assistance of counsel, Dixon *sub rosa* equates the validity of a waiver of the assistance of counsel guaranteed under the federal and state constitutions with an effective waiver of the assistance of postconviction counsel. See *supra* ¶ 44 ("We are dealing with a petitioner who exercised his statutory right to represent himself, a right that takes on constitutional dimension in the trial context."). But a waiver of the constitutionally guaranteed right to the effective assistance of counsel at trial and a waiver of the statutory right to the reasonable assistance of counsel during postconviction proceedings are two different things. Denial of the right to trial counsel of choice or the assistance of counsel at a critical stage of trial proceedings has been deemed structural error not subject to harmless error review. See *People v. Baez*, 241 Ill. 2d 44, 105 (2011) (violation of right to counsel of choice); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006) (denial of assistance of counsel at

critical stage). In contrast, the right to counsel in postconviction proceedings is not constitutionally guaranteed, but rather is the product of " 'legislative grace.' " *People v. Cotto*, 2016 IL 119006, ¶ 29 (quoting *People v. Hardin*, 217 Ill. 2d 289, 299 (2005)). For this reason, with respect to any defects in Dixon's waiver of the reasonable assistance of postconviction counsel, it is appropriate to engage in a harmless error analysis. And, by any measure, the "error" identified by Dixon was harmless.

¶ 141 Dixon urges reversal, arguing that his waiver of postconviction counsel was not voluntary, requiring remand so that the trial judge can make good on her "promise" to Dixon made in connection with and, Dixon claims, as a condition of that waiver. In particular, Dixon argues he was misled into believing that if he waived representation by the public defender, he would be provided access to the entirety of that office's files. This claim is without merit because (i) the Post-Conviction Hearing Act does not contemplate that access, (ii) the transcript of proceedings does not support Dixon's argument, and (iii) Dixon had been advised on numerous occasions, before he waived the assistance of counsel, that he would not be entitled to "discovery" (as *he* referred to the information in his former attorneys' files) unless his postconviction petition went to a hearing.

¶ 142 First, postconviction counsel was under no duty to review the work product of trial counsel in order to fulfill her duties to Dixon at the second stage. Rather, had Dixon not elected to proceed *pro se*, the affidavit his attorney would have filed with the amended petition, pursuant to Rule 651(c), would have stated that counsel had "examined *the record of the proceedings at the trial*." There is no requirement that postconviction counsel review the trial files and, in particular, the work product of the attorneys who defended the underlying criminal

case. So a petitioner who waives the reasonable assistance of counsel is not entitled to demand access to those materials either. By concluding that a postconviction petitioner who voluntarily elects to represent himself is entitled to demand production of his entire trial file because, as the former client, this material is not "discovery" and there is therefore no work product privilege, the majority simply puts the cart before the horse. When Dixon voluntarily waived the assistance of the public defender in amending his petition, he was not entitled to indirectly access the resources of that office by demanding that his former lawyers undertake to copy and produce to him not only their own files and work product regarding his postconviction petition, but also the files and work product of the lawyers who represented him in his underlying case.[10]

¶ 143 Second, on its face, the transcript of proceedings of the hearing during which Dixon waived his right to the reasonable assistance of postconviction counsel reveals no promise by an experienced and able trial judge that Dixon would be provided his entire file in order to make any amendments to his prolix postconviction petition he deemed necessary. Rather, the colloquy between Dixon and the court establishes just the opposite. After actively discouraging Dixon from waiving the assistance of postconviction counsel precisely because he would not have access to the resources of the public defender's office, Dixon asked the trial judge whether, other than the redactions of the names and addresses of witnesses, "I get everything [the public defender] got access to or had access to, right?" The court responded:

"I don't know exactly what all those documents are, so possibly we would have to

have a discussion about some of that, I don't know."

---

[10]That such a burdensome exercise is unnecessary is best illustrated by the extended hearing conducted by the trial court on Dixon's 60-page request for production *from the State*, which, as noted, was clearly "discovery." After the court painstakingly addressed every category of documents sought by Dixon and ordered that certain items be produced (albeit not by the Public Defender's Office but by the State), Dixon promptly responded that he did not need those items because he already had them.

Dixon then commented, "Well, *as long as I can get the documents and the stuff from the State, you know, I need that they get, any witnesses receive any special treatment for their testimony, any time cuts \*\*\**." (Emphasis added.)

¶ 144 As the transcript reveals, it was Dixon, not the court, who purported to place conditions on his waiver of the assistance of counsel, and those conditions were not limited to access to the public defender's files. Rather, Dixon also attempted to condition his waiver of counsel on being provided access to documents from the State. And yet Dixon does not argue that the trial judge "promised" him that he would have access to the State's records. Dixon fails to explain how the same comments by the trial judge can be construed to constitute a promise of access to one category of documents and not another. Fundamentally, the conditions Dixon attempted to place on his waiver were ones the trial judge never did and, equally importantly, never would have agreed to.

¶ 145 Third, Dixon was advised on numerous occasions that he was not entitled to "discovery" unless and until his postconviction petition went to hearing, *i.e.*, until *after* the court determined that he stated a substantial claim of constitutional deprivation. See *Lesley*, 2018 IL 122100, ¶ 51 ("The entire record should be considered in determining whether the waiver was knowingly and understandingly made." (citing *People v. Redd*, 173 Ill. 2d 1, 21 (1996))). Examination of the entire record makes clear that Dixon was well aware that he would not be entitled to pursue the broad-ranging discovery he sought.

¶ 146 All a court need do in order to assure itself that a postconviction petitioner's waiver of counsel is knowing and voluntary is "warn defendants of the consequences of their repeated refusals to work with appointed counsel and the difficulties of self-representation.*" Id.* ¶ 61.

Here, the trial court did exactly that and satisfied its duty to assure that Dixon's waiver was valid.

¶ 147    As proof that he was disadvantaged by the trial court's refusal to allow him to access his former counsel's files, Dixon points to a statement he made to the effect that had he known the documents would not be produced, he would not have elected to represent himself. Dixon's *post hac* complaint to the trial court, which was not made until June 23, 2011, more than a year after he waived the assistance of counsel and long after it was abundantly clear that those files would not be produced is precisely the type of manipulation we do not allow criminal defendants to engage in when it comes to waivers of counsel. *Id.* ¶ 59 (rejecting defendant's claim that he was "forced" to proceed *pro se*; when defendant refused to cooperate with his court-appointed attorneys and did not retain private counsel, he, by his conduct, "made a knowing and intelligent election to proceed *pro se*"). Further, Dixon only made this claim after pursuing repeated and unsuccessful attempts to have his case transferred to another judge, claiming that both the trial judge and the judge to whom his substitution of judge motion was assigned were biased against him.

¶ 148    The trial judge made clear to Dixon on April 30, 2010, during the hearing at which he elected to represent himself, and on numerous occasions thereafter, that he would not have unfettered access to the public defender's files. Indeed, at the very next status hearing during which Dixon's appointed counsel was still present, the court advised Dixon that he would have to show good cause for and the relevance of any discovery he sought. Yet, Dixon never requested reappointment of the public defender as his lawyer, a common occurrence when defendants come to appreciate the handicaps of self-representation.

¶ 149 There is no indication in this record that the trial judge, who conducted numerous protracted hearings on Dixon's motions and extended every courtesy to him during the four-year period when he represented himself, would not have allowed him to change his mind or would have refused to reappoint the public defender. Nothing in the record suggests that the trial judge, who consistently urged Dixon to allow the public defender to represent him, required him to make a snap judgment.[11] Rather, Dixon's insistence on self-representation in connection with his postconviction petition was just the latest in a long series of deliberate, knowing, and intelligent waivers of representation by counsel. Consequently, no error in connection with Dixon's waiver of counsel entitles him to a remand for further proceedings.

¶ 150 I would affirm the dismissal of Dixon's amended postconviction petition. Therefore, I respectfully dissent.

---

[11]Tellingly, although the majority notes that Dixon "reluctantly" sought to represent himself because postconviction counsel decided to raise "only two claims" on his behalf (*supra* ¶ 2), those same claims are the *only* two claims OSAD raises on Dixon's behalf in this appeal.